## NEW ORLEANS & NORTHEASTERN RAILROAD COMPANY *v.* ALFRED H. GEORGE.

1. RAILROADS. *Carriers of freight. Rules. Demurrage.*

   A railroad can make and enforce rules imposing reasonable demurrage charges on consignees for delay in unloading cars.

2. SAME. *Lien for demurrage. Code 1892, § 2108.*

   Code 1892, § 2108, giving a carrier a lien for freight and storage, with power to sell therefor, applies to demurrage for delay in unloading cars.

3. SAME. *Notice.*

   Formal notice is unnecessary to make a consignee liable for demurrage charges, if he knows of the arrival of the cars for him.

4. SAME. *Private sidings. Delivery, when full. Partnership sidings.*

   Under demurrage rules providing that the delivery of cars consigned to a siding used exclusively by individuals located thereon shall be considered as effected when, if the siding be full, the

road offering the cars would have made delivery had the siding permitted, delivery will commence, though the cars filling the siding are for another consignee, having equal right to use the siding.

5. SAME. *Demurrage on certain freight. Not on all.*

A demurrage rule prohibiting discrimination between persons, and providing, if car service be collected from one person, it must be from all who are liable, does not prevent demurrage being collected for cars loaded with certain kinds of freight, though it is not charged where they are loaded with other kinds.

6. SAME. *Several cars. Demurrage enforced on one for all.*

Where demurrage is due on several cars constituting a shipment, the charge for each car need not be enforced against its contents separately, but enough may be retained to satisfy the charge against all.

FROM the circuit court of Lauderdale county.

HON. GUION Q. HALL, Judge.

George, appellee, was plaintiff in the court below; the railroad company, appellant, was defendant there. The action was replevin for certain freights consigned to appellee and upon which the railroad company contended certain demurrage charges had accrued, and which plaintiff had declined to pay. The railroad claimed the demurrage under certain rules of the Alabama Car Service Association, to which it belonged, and of the Mississippi Railroad Commission. These rules were offered in evidence and are as follows:

RULES OF THE ALABAMA CAR SERVICE ASSOCIATION.

"Rule 1. *Per diem charges.*—All property shipped in carload lots shall be subject to car service and trackage charges in accordance with the following regulations: A charge of one dollar per car per day or fraction thereof shall be made for the delay of cars and the use of tracks within the following described territory, after forty-eight hours from arrival thereat, not including Sundays or legal holidays.

"Rule 2. *Rules for reckoning time.*— On cars arriving during the forenoon after 7 A. M., and held for orders from consignees, car service will be charged after the expiration of forty-eight hours from 12 M. of that day, and on cars arriving after 12 M. to and including 7 A. M. of the following day, car service charges will commence forty-eight hours from 7 A. M. of the following day, provided notification has been given during the day previous to this time.    Should notification not be given within the time, car service will commence forty-eight hours from the hour of notification.    On cars consigned to team tracks, and which may be so delivered on advance or standing order from consignee, car service will be charged after the expiration of forty-eight hours from the time such cars are placed on the tracks designated.

"Rule 3. *Cars for delivery on team tracks and private sidings.*— Cars containing freight to be delivered on team tracks or private sidings shall be delivered on the track designated immediately upon arrival, or as soon thereafter as the ordinary routine of yard-work will permit.    (a) The time consumed in placing such cars, or in switching cars for which directions are given by consignees, after arrival, shall not be included when computing detention.    (b) The delivery of cars consigned to or ordered to sidings, used exclusively by certain firms or individuals located on such sidings, shall be considered to have been effected either when such cars have been placed on the sidings designated; or, if such sidings be full, when the road offering the cars would have made delivery had such sidings permitted. (c) No cars shall be held from delivery in any manner, provided it is possible to secure their delivery, and the manager is charged with the duty of seeing that the purposes for which this association is formed are not evaded by the action of any railroad company.    (d) On deliveries to sidings, used exclusively by certain firms or individuals located on said sidings, and where consignees or consignors refuse to pay, or unnecessarily defer

settlement of bills for car service charges, the agent will decline to switch cars to the sidings where such parties are located, notifying them that deliveries will only be made to them on the public delivery tracks of the company after the payment of freight charges at his office, and will promptly notify the manager of the action taken."

.    .    .    .    .    .    .    .    .    .    .    .    .

"Rule 9. *Collections.*—Agents will collect car service charges accruing under the rules of the association with the same regularity and promptness as other transportation charges, and the manager is charged with the duty of seeing that these rules are enforced without discrimination.    (a) It is the duty of the agent to demand car service on all cars before delivering them, where service has accrued between notification and ordering. It is also the duty of the agent, where he has any doubt about service being paid, to demand one dollar car service at the end of the free time allowed for unloading cars; and, if said car service is refused, to decline to deliver the car and to allow the lading to be taken from it, either by sealing the car, locking the car,, or placing it where it is not accessible to consignee.    (b) All collections for car service charges shall belong to the road upon whose tracks the cars are detained.    (c) Railroads shall not discriminate between persons in car service charges.    If a railroad company collects car service from one person, under the car service rules, it must collect of all who are liable."

.    .    .    .    .    .    .    .    .    .    .    .    .

"Rule 12. *Storage.*— No railroad company, member of this association, shall provide free storage in its freight warehouse of contents of loaded cars subject to car service charges, but any railroad company may unload cars subject to car service charges into its own warehouse or into public or private warehouses subject to the following rules and regulations:    .    .    .    ."

.    .    .    .    .    .    .    .    .    .    .    .    .

RULES OF THE MISSISSIPPI RAILROAD COMMISSION.

"Rule 1. *Railroad companies to give prompt notice of arrival of goods.*— Railroad companies shall give prompt notice, by mail or otherwise, to consignee of arrival of goods, together with weight and amount of freight charges due thereon; and, when goods or freight of any kind in carload quantities arrive, said notice must contain letters or initials of the car, number of the car, net weight and the amount of freight charges due on the same.   Storage and demurrage charges may be assessed if the goods are not removed in conformity with the following rules and regulations.   No storage or demurrage charges, however, shall in any case be allowed, unless legal notice of the arrival of the goods has been given to the owner or consignee thereof by the railroad company.

"Rule 2. *Definition of legal notice.*— Legal notice referred to in these rules may be either actual or constructive.   Where the consignee is personally served with notice of the arrival of freight, free time begins at 7 o'clock A. M. on the day after such notice has been given."

.    .    .    .    .    .    .    .    .    .    .    .    .

"Rule 4. *Demurrage on loaded cars — how assessable.*— Loaded cars, which by consent and agreement between the railroad and consignee, are to be unloaded by consignee, such as bulk meat, bulk grain, hay, cotton seed, lumber, lime, coal, coke, sand, brick, stone and wood, and all cars taking track delivery, which are not unloaded from cars containing same within forty-eight (48) hours (not including Sundays or legal holidays), computed from 7 o'clock A. M. of the day following the day legal notice of the arrival is given, and the car or cars are placed accessible for unloading, may be subject thereafter to a charge of demurrage of one dollar per car for each day or fraction of a day that said car or cars remain loaded in the possession of the railroad company; it being understood that said car or cars are to be placed and remain accessible to the consignee for the pur-

pose of unloading during the period in which held free of demurrage; that when the period of such demurrage charges commences they are to be placed accessible to the consignee for unloading purposes on demand of the consignee; provided, however, that if the railroad company shall remove such car or cars after being so placed, or in any way obstruct the unloading of the same, the consignee shall not be chargeable with the delay caused thereby; provided, further, that when any consignee shall receive four or more cars during any one day loaded with lumber, laths, shingles, wood, coal, lime, ore, sand or bricks, and all cars taking track delivery, the said cars in excess of three shall not be liable to demurrage by any railroad company until after the expiration of seventy-two (72) hours."

.    .    .    .    .    .    .    .    .    .    .    .    .    .

Plaintiff was engaged in the wholesale grain and feed business in Meridian. He handled large numbers of cars of hulls, feed stuff, grain, and other commodities requiring track delivery. Some of these cars were unloaded at Meridian, and some rebilled to other points. For convenience in unloading and handling freight, George had leased a portion of a warehouse which was located on a spur track known as the "Compress Track," the larger part of which was used by the Cotton Compress Company and other concerns; and, as their warehouses were situated further up the spur track, all of the cars used by them had to pass over that portion of the track to the use of which George was entitled, thus necessitating the reswitching and replacing of his cars; but the lease to George was made with full knowledge on his part of this condition of affairs. George's warehouse only had trackage for four cars. It was the usual course of dealing between George and the railroad company that the cars were to be set into his sidetrack on arrival, without special demand, and the representatives of the Alabama Car Service Association would check the cars on the track each day to see that there was no unnecessary delay in the switching

and placing of the cars.    The railroad company also had an employe who was charged with the duty of checking all cars on the track, and this double checking was recorded in books kept for that purpose, and the results compared to guard against errors.    On Saturday, December 7, 1901, a train of twelve cars loaded with cotton seed hulls, loose in bulk, reached Meridian, consigned to George.    On arrival this train was placed on the storage track, appellant contending that was necessary on account of the crowded condition of the compress track.    On Monday, the 9th, the compress track being still crowded with cars, the train was switched to the waterworks track.    It was shown that at this date the railroad business at Meridian was extremely large.    Every track was in constant use.    Every car was needed for the transportation of cotton and other freight. On the same day notice of the arrival of this freight was sent to George, but he declined to receive the freight bills, claiming an overcharge.    George denied that the freight bills were tendered to him, but he paid the freight charges on the twelve cars of hulls on the 13th inst., and either that day or a few days thereafter, had the overcharge corrected.    George knew of the rules of the Alabama Car Service Association, was familiar with the provisions regarding demurrage, had paid some demurrage and had refused to pay some, and at this date had a litigation pending about another matter of demurrage.    None of the cars composing the train were placed in front of the warehouse of George.    The Car Service Association's representative and the railroad company's car checker both testified that at no part of the "free time" after the arrival of this train did George have less than four cars on his sidetrack, and an inspection of their original books corroborates this.    George was notified during the free time that demurrage would accrue, and shortly after the free time expired he was again advised of this claim, and then and there denied his liability, denied the right of the railroad company to claim demurrage, and refused to pay.    The

manager of the Car Service Association instructed the railroad company not to deliver the cars until the demurrage was paid. So matters stood until about 1st of February, 1902, when the railroad company released six of the cars to George, and notified him of its intention to sell the contents of the remaining six for the demurrage on the twelve. Thereupon this suit was filed for the contents of five, the hulls in the other proving worthless. At the conclusion of the testimony the court refused a peremptory instruction for the defendant, and submitted the case to the jury under instructions for both sides. The jury found for plaintiff, a judgment was entered on the verdict in plaintiff's favor, and the railroad company appealed to the supreme court.

*Fewell & Son,* for appellant.

The questions involved in this case are:

1. Did the appellant have the right to charge demurrage?

2. Did the appellant have the right to refuse to deliver the contents of the cars or to set the cars into appellee's warehouse because of the refusal of the appellee to pay the demurrage?

3. Whether any demurrage had accrued.

If 'the railroad company had a right to hold the cars for demurrage, as the court instructed it had, and if any demurrage was due, George had no right to the possession of the hulls until and unless the amount so due was either paid or tendered. He had notice of the arrival of his cars, he admits that he knew of their arrival; he paid the freight on them; he allowed them to remain on the siding on which they were placed until the "free time" had expired; he made no offer to pay any amount and allowed the cars to remain there about two months, continuing to have other cars set into his siding and keeping the room he had (which was only for four cars) occupied constantly, never giving any notice of there being room. According to appellee's theory, it was the duty of the railroad company to keep a con-

stant watch on the "compress sidetrack," and from day to day and from hour to hour to put a car or cars into that siding whenever there was room, whether George wanted them set in or not. We know of no rule or law which requires a carrier, especially under the circumstances of this case, to keep such watch. Besides the undisputed fact that the siding referred to served other people and was all of that season very much crowded, shows it to have been impossible to find room for George's cars. If he wanted the twelve cars to be placed on the siding in preference to others he was daily handling, did it not devolve on him to make a request to that effect? Allowing cars daily arriving to be put in was an acquiescence in that course. He knew that the demurrage was accruing, and yet he took no steps to stop it; he chose to use the appellant's cars as warehouses for his stuff, thus putting the appellant to great loss by that use of its cars and its siding. There is no dispute that the siding to the appellee's track was much congested — George did not deny it and his own witness, Shepherd, testified to the fact. The result of the trial is that George has had for nearly two months the use of the twelve cars and the siding without a cent's compensation, and that the railroad company and the public lost the use of these cars for all that time. What was the railroad to do? Appellee did not want the freight unloaded at any other place; the railroad people expected from day to day that George would do something to settle the matter. We ask again, what was the railroad company to do? It is shown that during the month of December, 1901, 17,500 cars arrived at Meridian from the three roads embraced in one agency, viz.: the A. G. S., the A. & V., and the N. O. & N. E. R. R., and 15,000 in January, 1902; what, under the circumstances, could the railroad company do?

The railroad claims the right to charge demurrage because of certain rules laid down by what is called the Alabama Car Service Association, to which all the railroads in this section

has committed the matter of demurrage. See the Alabama Car Service Rules and the Mississippi Railroad Commissioners Rules and orders on the subject of demurrage which are in evidence.

It is contended that the railroad company had no right to sell a part of the hulls, that it could only sell each car load for the amount due on the car in which it was loaded. Let us see how fallacious that argument is, and to what an absurdity it would lead. The railroad company has twelve cars, upon each car there is a demurrage of $50. The consignee does not demand any particular car or offer to pay any demurrage accrued on any car. The railroad company, patience exhausted and wanting its cars and the demurrage, proceeds to sell the hulls for the proceeds. How many car loads shall it sell? Must it sell each car load for the amount of demurrage accrued on that car? It says: "No, we will only keep and sell a sufficiency of the hulls to make our money; we think six car loads is enough, and we will release the other six," all the hulls belong to the same person. Can that person be heard to complain and say you must sell all our stuff, you do us a wrong, and you violate the law in releasing any of our cars? You ought to have put up the contents of each car and sold it for the amount due on that particular car. Nonsense. The appellee was benefited by the release of the six cars, for the other six did not bring enough to pay the demurrage.

The right to charge demurrage cannot be questioned at this day even by the common law. 9 Am. & Eng. Enc. Law (2d ed.), 261, and notes. But if no such right exists by the common law, it is given by our railroad commission's rules.

The railroad company in this instance conformed to the commission's rules. Sections 2108-9, Ann. Code of Mississippi.

As to the right to hold the cars until the demurrage should be paid we have no doubt. If the railroads have no such right,

they are at the mercy of insolvent consignees or would be
driven to lawsuits and consequent delays and expenses.

· It is admitted that $1.00 per day per car is a reasonable
amount to charge.

The court will observe that the charge of "demurrage" as it
is called, is not strictly demurrage, which is a maritime term,
but more properly a charge for storage, and that the railroad
company had the same rights that a warehouseman would have
had to withhold delivery until payment of charges; by some of
the decisions referred to it is stated that quoad this charge the
railroad company ceasing to be a carrier had become a ware-
houseman.

The charge was for storage, for the use of the cars, and there
can be no difference in the rights of the parties when the goods
were in a warehouse and when they were stored in the cars.

The bold and patent fact stands out that of his own choice,
George allowed his goods to remain in the cars, and that he had
the use of the cars for nearly two months, and for that time
deprived the appellant of the use of its cars, at a time, too, when
there was a car famine.

Shall he pay for such use or damage or shall he wrong the
appellant? The jury, we submit, willfully disregarded the
testimony and the instructions of the court and found a verdict
which has neither law or fact to rest on. *Gulf City C. Co.* v.
*L. & N. R. R. Co.,* 25 So. Rep., 579.

Our statute gives the right to warehouses to hold and sell
goods not called for. Code 1892, § 2108. And the appellant
occupied the position quoad this transaction of warehouseman.
*Dixon* v. *Ga. R. R. Co.,* 35 S. E., 369.

*Miller & Baskin* and *Neville & Wilbourn,* for appellee.

Demurrage charges had not rightfully accrued for the
following reasons:

1. Because no legal notice of the arrival of the cars had
been given.

2. Because the cars had never been placed by appellant accessible for unloading at appellee's warehouse or anywhere else and allowed to so remain during the free time, nor had any tender to place them been made by appellant.

3. Because, admitting the general proposition as to the right of carriers to exact charges in the nature of demurrage charges, under proper regulations and circumstances, where consignees are at fault, the right of appellant to make any such charge does not exist, because appellant unlawfully discriminated in the matter of such charges in favor of shippers of cotton, not exacting demurrage charges for the detention of cars loaded with cotton.

4. Because, no matter whether the right to exact such charges exists or not, the carrier is not entitled to any lien therefor, which would authorize the carrier to withhold the product from the consignee, refusing to pay such charges.

There was conflict between witnesses for appellant and appellee on the question of legal notice of the arrival of the cars. Appellee says he got no notice from appellant, though he frankly admits that he knew the cars had arrived.

It was the duty of the appellant to place cars accessible to the appellee's warehouse for unloading. *Vincent* v. *Chicago & Alton*, 49 Ill., 33, cited and approved in *Coe* v. *L. & N. R. R. Co.*, 3 Fed. Rep., 775. See also Rules of Mississippi Railroad Commission in record, which are the only rules that are applicable to demurrage charges in this state. Under the facts, appellant failed to show a compliance with its duty, or legal excuse for not doing so, entitling it to charge demurrage, in this case, whatever may be the general law as to the right to charge demurrage in proper cases.

Appellant could not enforce its regulations, nor those of the Mississippi Railroad Commission because of its unlawful discrimination in favor of cotton shippers using its cars and

tracks.  See admirable note on this subject in 41 Am. Dec., 484.

Appellant had no lien upon the product in the cars, whatever may have been the facts of the case.

1. There was no contract, express or implied, for a lien. There was no bill of lading stipulating for it; and the custom and usage between the parties had been almost invariably, according to the testimony, to deliver the product first, and demand demurrage, if any, afterwards.  The Car Service Rules had never been promulgated to appellee, and he had never seen them.  He had no notice of a claim for a lien, and neither expressly nor impliedly contracted for any.

2. There is no statutory lien for demurrage charges.

3. There could be no lien for demurrage on the six cars previously delivered.  Each car was distinct, and as to the six delivered, appellant waived its lien, if it had any, which we deny.  5 Am. & Eng. Enc. Law (2d ed.), 400.

4. Under the better reasoned decisions, and those in which the point was squarely presented, the existence of any lien for demurrage is denied.  Hutchinson on Carriers (2d ed.), sec. 474, and notes; *Chicago etc. R. Co.* v. *Jenkins,* 103 Ill., 588; *Burlington etc. R. Co.* v. *Chicago Lumber Co.,* 15 Neb., 390; *Crommelin* v. *New York etc. R. Co.,* 4 Keyes, 90, 1 Jones on Liens, sec. 281-2; *Railroad Co.* v. *Hunt,* 83 Tenn. (Lea), 261; Redfield on Railroads, 206.

There was no lien at common law except to warehousemen; and no lien at all, except upon two conditions: (1) possession, (2) that the charge for which the lien was asserted was for some service or benefit bestowed upon the very thing itself, or that the debt was incurred with respect to the very goods detained.  *Friskell* v. *Morris,* 6 L. R. A., 80.  If these principles are applied to this demurrage charge it will be seen that no lien can be logically worked out.  Let us not be confused in our reasoning by the name given to the charge, by any consideration

of convenience to either party, or by what it may be argued the law ought to be.

Argued orally by *J. W. Fewell,* for appellant, and by *R. E. Wilbourn,* for appellee.

TRULY, J., delivered the opinion of the court.

This suit involves the determination of the following questions: First, are the rules for the collection of demurrage valid? and, second, if so, how are they to be enforced?

Car service associations are formed by mutual agreement among the railroad companies operating in a stated territory. They owe their existence to the growth of the business interests of the country, the enormous increase in the bulk of through freight handled daily, and the consequent extension of the many railroad systems handling the same. With every increase in the volume of the freight brought into a section from distant markets, hauled, without unloading, over the tracks of many connecting systems of the same gauge, it became more difficult for each carrier to keep track of its own cars. As the cars of each system were handled indiscriminately by every other system, they soon drifted to every quarter, as the current of traffic ebbed or flowed, and their whereabouts were often unknown to the carrier owning them. To correct this evil, car service associations were formed, the primary object of which was to prevent loss by keeping a daily record of every car handled by each carrier, so that each system might receive compensation for the use of its rolling stock, and no unfair advantage be taken by one system over another, and, further, to prevent cars standing idle at one place when needed to meet the traffic demands of another section of the country. These organizations had a beneficial effect, in preventing congestion of empty and idle cars at one point, while a "car famine" prevailed at another. But it soon became apparent that the remedy was not complete. Carriers earn money by the moving of freight. The idle car produces

no revenue, and the car service associations found that, while it was possible, under its then existing rules, to keep the unloaded cars moving from place to place as necessity might require, they were without power to have the freight promptly unloaded by the consignee, thus securing the car for further service,  The merchant who bought goods for sale from his shelves or through his warehouse was ordinarily anxious to receive and unload his freight, but the broker who wished to do a large business with limited or no warehouse facilities found it cheaper and more convenient to use the cars of the carrier for storage purposes, and thus, with no expense to himself, wait a favorable fluctuation of price, when the commodity could be disposed of to advantage, and the car unloaded or rebilled to another place without unloading.   To meet this contingency, the demurrage rules in question  were formulated and promulgated.  It should be noted that the purpose of car service associations was not to make money.  They increased the revenue of the contracting carriers only incidentally, in that, by keeping every car in active service, the earning capacity was constantly exerted, and the returns therefrom increased.   But the prime object of their formation was to conserve and promote the mutual interest of the carriers and the public dealing with them, by improving the service of the traffic department, and insuring the prompt handling and speedy delivery of freight to the consignee.

It is admitted that the amount charged under the demurrage rules is reasonable, and it appears to us that the rules, so far as applicable to this controversy, in themselves are fair, and based upon that fundamental maxim of justice, "The greatest good to the greatest number."   The carrier of freight is responsible in damages if it unreasonably delays the transportation of freight delivered to it, and exact justice demands equal diligence of the consignee.  When freight has been transported to its destination and the consignee legally notified of its arrival, it then becomes

the duty of the consignee to promptly receive the same, so that the car may again be placed in service. These rules work no hardship to the consignee who displays proper diligence in the handling of his freight. Ample time is granted him. But they prevent the dilatory dealers, who seek to save storage or warehouse charges, from keeping the tracks blocked with idle cars; thereby impeding the carriers in the prompt handling of freight, and depriving other dealers of the use of necessary cars to haul their freight or transport the products of the country to market. Certainly no reason, founded in justice, can be given why consignees should not pay for any unreasonable or unnecessary detention of cars. Prompt handling of freight by both carrier and consignee is for the best interests of both, and of the commercial world at large. This question was never before in this court, but this view is in full accord with an almost unbroken line of decisions in other states; and, precedent aside, it is supported by justice and right. *Norfolk & Western R. Co.* v. *Adams,* 90 Va. 393, 18 S. E. 673, 22 L. R. A., 530, 44 Am. St. Rep., 916; *Kentucky Wagon Mfg. Co.* v. *O. & M. Ry. Co.,* 98 Ky., 152, 32 S. W., 595, 36 L. R. A., 850, 56 Am. St. Rep., 326, and cases cited. They have also been approved by various state railroad commissions charged with the duty of guarding the interests of the public. It is well settled that railroad companies may make reasonable rules and regulations, not to limit their own duty or liability, but for the convenient transaction of business between themselves and the shippers of freight over their lines.

Having reached the conclusion that the rules imposing reasonable demurrage charges upon dilatory consignees are fair, just, and enforceable, we now pass to a consideration of the manner of their enforcement. It should be borne in mind that the duty of the railroad company as a carrier of freight terminates, under the decisions of our court, when, the freight having reached its destination in good order, the consignee is legally

notified of its arrival. After that time the railroad holds as warehouseman and bailee for hire. But in the present case, whether appellant held as carrier, or as warehouseman and special bailee, it was, in either of these capacities, rightfully in possession, and had the right to retain that possession until its legitimate charges were paid. This is a suit in replevin, in which "right of possession" is the only question of law involved. If there was any sum due appellant, whether little or much, the verdict should have been that it retain possession.

It is earnestly insisted that the railroad company has no lien on the freight for demurrage charges either by statute or at common law. It may be true that there is a technical distinction between the lien here claimed and the common-law lien, though the difference is more imaginary than real; but it is undoubtedly true that the warehouseman, as bailee for hire, has a lien for his reasonable charges, and this is recognized as to warehousemen by the express terms of section 2108, Code 1892, in which a lien is given for freight and storage, coupled with a power to sell in a manner therein pointed out. If a carrier has a lien for storage charges if the freight is unloaded into a warehouse, upon what principle can it be denied if, by the action of the consignee, the cars themselves become the storage houses— particularly when, as in this case, the consignee knows in advance, by his course of dealing with the carrier, that the charges will be incurred if he delays in receiving his freight? In our judgment, by necessary implication, the Code chapter on "Freight and Storage" carries with it the necessary lien to enforce the collection of all reasonable charges incident to the handling of freight. In a case of this character, involving the dealings of carrier and public, the courts will not narrowly restrict the meaning of the statute, but will rather "expand the principles of law, and fit them to the exigencies of the occasion," as was aptly phrased by that eminent jurist, Chief Justice Cooper, in discussing a similar proposition. *Telegraph Co.* v.

*Allen,* 66 Miss., 555, 6 South., 463. Knowing the rules governing the transaction, the voluntary action of the consignee gives an implied assent to the charge and lien which those rules assert. By the sole action of the consignee, the carrier is forced to retain possession of the freight. By operation of law, it is required to keep, store, and care for the property of another. It is, under the law, entitled to compensation for its services in this connection, and the law gives it a remedy to enforce its rights. In the case of *Wolfe* v. *Crawford,* 54 Miss., 514, our court, in discussing the right of a carrier as a bailee, says: "But the right of the general owner [of the freight] to be restored to the possession is dependent on the payment or tender of the freight and other charges on the goods to the carrier. For these he has a lien, which would be lost if he parted with the possession, and he cannot be compelled to make delivery until they are discharged. The general owner cannot dispossess the carrier of the goods without payment or tender of his legal demands upon them." Again: "But a bailee, until the conditions of the bailment have been accomplished, has a property in the chattels, and a possession which is exclusive, both as to the general owner and strangers. . . . His right and possession extend to the entire property; nor can the bailor, or any one claiming through him, interrupt and defeat his rights until a satisfaction of his claim, or an offer to do so. The common carrier, warehouseman, and all the class of bailees who have a beneficial interest, have a right of possession and a lien in the thing. These rights are inviolable until the acts and purposes for which they were created are performed." In *Miller* v. *Ga. R. Co.* (Ga.), 15 S. E., 316, after stating the general rule that a carrier had a right to collect reasonable storage, the opinion proceeds: "We do not think it material as affecting the right to make a charge of this character, that the goods remain in the cars, instead of being put into a warehouse." 28 Am. & Eng.

Enc. of Law, 28, p. 663; *Dixon* v. *Central of Ga. Ry. Co.* (Ga.), 35 S. E., 369; *Barker* v. *Brown,* 138 Mass., 340.

There is no force in the argument which concedes the right of the carrier to make demurrage charges, but contends that the goods must be delivered, and then the carrier sue for the amount. This course would give the dishonest and insolvent an unfair advantage, and would breed a multiplicity of suits.

It is contended for appellee that, whatever may be the general rule, in the instant case the appellant should be defeated of its recovery because it failed to bring itself within the rules allowing demurrage, in this: It failed to notify consignee in the manner pointed out, and it failed to tender delivery of the freight as required by the rules of the car service association.

As to the first contention, it is enough to say that the object of the rule was reached, and the law fully complied with, when George was advised of the arrival of the twelve cars, though, if the testimony of Hall, as supported by the entries in his notice book, be true, the rule was literally complied with.

As to the second contention, there is conflict as to the fact. It is true that the cars were not in fact placed in front of George's warehouse, but the testimony does not clearly show that it was the fault of appellant. On the contrary, the testimony of Fewell, the representative of the car service association, and of Lowry, car checker of appellant company, supported by the contemporaneous entries in their record books, if believed by the jury, show conclusively that, during all of the "free time" to which appellee was entitled under the rules, placing in front of George's warehouse was prevented by an accumulation of cars consigned to George himself. This is contradicted by Shepherd, car checker for appellee, while appellee himself testified that "there was no place to deliver them. They had our track full of cotton." With the sharp conflict of testimony on this point, clause "b" of rule 3 must be considered: "The delivery of cars consigned to or ordered to sidings used exclusively by certain

firms or individuals located on such sidings, shall be considered to have been effected either when such cars have been placed on the sidings designated; or, if such sidings be full, when the road offering the cars would have made delivery had such sidings permitted." It was claimed by appellant that the cars would have been placed on siding on arrival, had the siding permitted. There is much proof that the siding was full. Whether the siding was filled with cars consigned to George or to the cotton compress, in either event appellant was excused from delivering upon the siding. If George had his full quota of cars, then he had no ground of complaint. If the siding was filled with cars for the compress, it had equal right to use of siding, and appellant is not liable. The court correctly instructed the jury on this point by the fifth instruction for defendant, but also gave the second instruction for plaintiff; and, in the light of our conclusions, this was error. By this instruction the jury were told that it devolved upon defendant to prove by a preponderance of the evidence that it notified plaintiff of the arrival of the cars, and placed them on the side track adjacent to plaintiff's warehouse, or "to show circumstances of excuse or justification therefor." This was misleading. By it the determination of certain questions was submitted to the jury, whereas in fact the questions were not in dispute. The jury did not have to pass on the question of notice. George's own testimony leaves no doubt of his knowledge of the arrival of the cars. In the light of the instructions for defendant, the jury were left in doubt as to what was meant by "circumstances of excuse or justification therefor."

To sum up, the sole question of disputed fact involved in this record is: Was the siding so filled with cars consigned to George or to others entitled to the use of the side track, as to prevent the railroad company placing the cars until after the expiration of the "free time?" If so, the railroad was entitled to the verdict. If not, George should recover. Upon this sole question is there

sufficient conflict to justify the submission of the cause to the jury for determination?

The ingenious but fallacious argument is made that the railroad company should not be permitted to claim the fact, if fact it be, that the siding was full of cars consigned to the compress, as an "excuse or justification" (in the language of the second instruction for plaintiff) for the failure to place the cars in question, because of the unjust favoritism shown the compress company by the railroad company in not charging demurrage on cars loaded with cotton. This is not within the condemnation of the rule. Clause "c," rule 9, prohibits discrimination between persons, and says that, if the car service be collected from one person, it must be collected "of all who are liable." This is to prevent discrimination between persons handling cars loaded with the same class of freight, so that if car service is collected from one dealer handling hulls or flour or grain, or other class of freight, it must be collected from all dealers handling the same class of freight. But in the instant case, car service was collected from no car loaded with cotton or coal, no matter by whom handled, anywhere within the territory covered by the Alabama Car Service Association. It is to be seriously doubted whether under the undisputed testimony of the assistant manager of the Alabama Car Service Association, the carriers have the authority to impose car service on the cars loaded with cotton or coal. We know of no reason why we should condemn as unlawful or unjust the exemption of cars loaded with cotton or coal from car service charges, while many reasons present themselves to commend the equity of the rule. In construing the language of said second instruction, the jury might well have inferred, when considering all the instructions together, that even though the siding was filled with cars for George or the compress, this was no "excuse or justification" for the appellant, because no car serivice was collected of the compress. And this position is not maintainable.

For the error in giving the second instruction for plaintiff, above referred to, which is in itself erroneous and misleading, and is in conflict with the other instructions for both plaintiff and defendant, the case is reversed and remanded, and a new trial awarded.

As a new trial must be awarded for the error indicated, one further question presents itself for decision. Did the railroad company forfeit its claim for demurrage upon the six cars released by releasing them, or can it hold the remaining six for the charges upon the entire twelve? The twelve cars in question constituted one shipment, belonging to one owner, received at the same time. Further, a different amount of demurrage was due, if any was due, upon four cars, from what was due upon the remaining eight. There was no way to distinguish the four cars from the eight, except by arbitrary selection. The cars were all loaded with the same commodity, loose, in bulk. In 28 Am. & Eng. Enc. of Law, the rule is stated: "The lien [for storage charges] is a right to retain possession of the goods until the satisfaction of the charges imposed upon them. It is specific upon the goods stored for the particular charges for such storage, although the entire lien extends to every parcel of the goods stored at any one time." In *Schmidt* v. *Blood,* 24 Am. Dec., 143, it is said: "A warehouseman has a lien upon the balance left in his hands of an entire lot of merchandise intrusted to him at the same time, after a delivery of part, for the storage of the whole." And the same conclusion is reached in *Steinham* v. *Wilkins,* 42 Am. Dec., 254—a thoroughly well reasoned case—and fully supported by citation of numerous authorities. In *Pennsylvania Steel Co.* v. *Ga. R. & Banking Co.,* 94 Ga., 636, 21 S. E., 577, it was decided that a railroad company had the right to retain from each consignment one or more cars to secure itself for the freight and demurrage it claimed on such consignment. And we think this the true and just rule, supported by reason and the more modern decisions. We are un-

able to see why it should be required of the carrier that it retain twelve cars loaded with the same commodity, belonging to the same owner, when the contents of a fewer number of cars is sufficient to liquidate its charges on all, especially in a case where, as in the instant case, a dispute has arisen as to the validity of the charges claimed, and the consignee is willing to receive the contents of the other cars. As quoted, the conclusion of the Supreme Court of Georgia occurs to us as being the just, sensible, and convenient rule. It avoids the sale of a large amount of freight for the collection of a trifling sum, it saves the consignee the possibility of a loss by the sacrifice of his property at a forced sale, and it gives the carrier the speedy use of its cars for the moving of other freight. We note nothing in the rules under consideration forbidding such action, and it commends itself to us as being the proper course. If the question of fact be decided in favor of appellant, that it is entitled to any demurrage in this case, the six cars retained by it are liable to the charges on the entire twelve constituting the shipment.

For the reasons hereinbefore stated, the case is

*Reversed and remanded.*