## GAULT LUMBER CO. v. ATCHISON, T. & S. F. RY. CO.

No. 2446.   Opinion Filed February 11, 1913.

(130 Pac. 291.)

1. **CARRIERS—Interstate Shipments—Last Connecting Carrier—Demurrage.** The last connecting carrier of an interstate shipment has authority to apply the proper interstate tariffs, and collect demurrage due, on foreign cars in its possession, which have been used in transporting interstate shipments.

2. **SAME—Lien for Demurrage.** A carrier, engaged in transporting interstate commerce, has a lien for demurrage charges on the shipment left in a car after the expiration of the free time allowed by the interstate tariffs under which the shipment was made.

3. **SAME—Demurrage Charges—Lien—Waiver.** A carrier does not waive its lien for demurrage charges on shipments left in cars after the "free time" for unloading same has expired, notwithstanding the carrier has "spotted" the car and has permitted the consignee to remove a portion of the shipment. Such a delivery on the part of the carrier is not an unconditional delivery, but is a qualified delivery for the purpose of permitting the consignee to remove the shipment within the "free time" allowed; if more time is used than allowed by the tariffs in force, the carrier may, to enforce its lien for demurrage, take possession of the car, notwithstanding a part of the cargo has been unloaded by the consignee.

(Syllabus by Robertson, C.)

*Error from Oklahoma County Court;*
*Sam Hooker, Judge.*

Action by the Gault Lumber Company against the Atchison, Topeka & Santa Fe Railway Company.   Judgment for defendant, and plaintiff brings error.   Affirmed.

*Warren K. Snyder,* for plaintiff in error.
*Cottingham & Bledsoe* and *Charles H. Woods,* for defendant in error.

Opinion by ROBERTSON, C.   This is an action in replevin to recover possession of certain lumber contained in car No. 13112, initials S. W., of the value of $320.50, and certain other

lumber contained in car No. 70397, initials M. K. & T., of the value of $92.91. The cause was tried to the court, without a jury, on an agreed statement of facts (and other evidence.)

The agreed statement reads as follows:

"That the two cars containing the lumber and building material involved in the above entitled cause bear numbers and initials as follows: 'S. W. No. 13112,' and 'M. K. & T. No. 70397.' That car S. W. No. 13112, and the shipment therein contained, originated from Minden, in the state of Louisiana. That the car M. K. & T. No. 70397, and the lumber and material therein contained, originated and was shiped from Groveton, in the state of Texas. That the car S. W. No. 13112, reached the tracks of the Missouri, Kansas & Texas Railway Company at Oklahoma City on the ................ day of................, That the Gault Lumber Company was notified of the arrival of car No. 13112 at 8:20 o'clock a. m. on the 26th day of June, 1908. That the Gault Lumber Company was notified of the arrival of car No. 70397 at 8:30 o'clock a. m. on the 24th day of June, 1908. That car No. 13112 was set on the spur track of the defendant at the rear of the place of business of the plaintiff, the Gault Lumber Company, in Oklahoma City, at 5:10 o'clock p. m. of June 29, 1908. That car No. 70397 was actually set or placed on the track of the defendant in the rear of the place of business of the plaintiff in Oklahoma City, state of Oklahoma, at 5:10 p. m. on the 2d day of July, 1908. That car No. 13112 was locked by the defendant on the 3d day of July, 1908, at 10 o'clock a. m. of said day. That car No. 70397 was locked by defendant at 9:30 o'clock a. m. July 7, 1908. That, at the time said cars were locked, they contained the lumber described and set out in plaintiff's petition and affidavit of replevin, and the said cars had been unloaded, save and except lumber contained in them at the time they were locked by the defendant. It is stipulated and agreed that this agreement as to the facts and the extent herein agreed shall not be considered as being a full agreement as to all the facts, but the other things necessary to make out a cause or make a defense may be proven by the parties acting through their attorneys just as though this agreement had not been entered into."

The evidence further shows that immediately after the expiration of the 48 hours "free time," allowed by the railway company for unloading these cars, had expired, demand was made

by the railway company for payment of demurrage charges, on each car, at the rate of $1 per day for each day after the so-called "free time" had expired; that the plaintiff refused to pay the same; and that thereupon the railway company took possession of said cars and locked the doors, whereupon plaintiff brought replevin. Judgment was entered in favor of the railway company, and the plaintiff, feeling aggrieved, brings error.

Three separate propositions are raised and urged by plaintiff in error in the presentation of this case, viz.: First, that the defendant was not the proper party to collect this demurrage charge, because it did not own the cars in which the freight was loaded; second, that the law did not give the defendant·a lien for demurrage charges; and, third, if the law did give a lien, that lien was waived by delivery of the shipments.

The proposition first above set out is thoroughly and completely disposed of by defendant in error in its brief, wherein it is shown:

First. That it was the last connecting carrier of an interstate shipment. *U. S. v. Stockyards Co.* (C. C.) 162 Fed. 556; *Railway Co. v. Wichita Who. Gro.,* 55 Kan. 525, 40 Pac. 899; *Railway Co. v. Rock Island,* 109 Ill. 135, 50 Am. Rep. 605; *Ky. Wagon Mfg. Co. v. R. R. Co.,* 98 Ky. 152, 32 S. W. 595, 36 L. R. A. 850, 56 Am. St. Rep. 326; *Heymann v. Railroad Co.,* 203 U. S. 270, 27 Sup. Ct. 104, 51 L. Ed. 178, 7 Ann. Cas. 1130; *McNeill v. Railroad Co.,* 202 U. S. 543, 26 Sup. Ct. 722, 50 L. Ed. 1142; *Stockyards Co. v. L. & N. R. Co.,* 118, Fed. 113, 55 C. C. A. 63, 63 L. R. A. 213; *Interstate Commerce Com'n. v. Chicago Ry. Co.,* 186 U. S. 320, 22 Sup. Ct. 824, 46 L. Ed. 1182; *Walker v. Keenan,* 73 Fed. 755, 19 C. C. A. 668; *Houston & Tex. Central v. Mayes,* 201 U. S. 321, 26 Sup. Ct. 491, 50 L. Ed. 772; *West Tex. Fuel Co. v. Tex. & Pac.,* 15 Interest Com. Com'n R. 443.

Second. That the cars while in its possession were detained by the plaintiff for such a period as to call into operation an interstate tariff.

Third. That, being one of the connecting carriers of an

interstate haul, it became the duty of this defendant to apply the proper interstate tariffs to the facts arising and as they arose.

Fourth. This tariff provides, among other things, as shown by the Record, p. 60, that it applies to *all* cars and applied to the cars in question. We quote two sections of this tariff:

"Applying at all stations on the A., T. & S. F. Ry. Co., in Missouri, Kansas and Oklahoma and Indian Territories; also all stations on the Leavenworth & Topeka Ry. in Indian Territory, Ardmore and North, and Superior, Neb."

"Rule 2. Car Service Charges.—After the expiration of the free time allowed, a charge of one dollar ($1.00) per car for each twenty-four (24) hours or fraction thereof shall be made and collected for the detention of all cars held for loading or unloading or subject to orders of consignors, consignees, or their agents."

The second proposition, that the law does not give a carrier a lien for demurrage charges, on first thought, under the early decisions of the courts, might seem to be tenable, yet an examination of the Hepburn Act (Act June 29, 1906, c. 3591, 34 St. at L. 584 [U. S. Comp. St. Supp. 1911, p. 1288]), convinces us that demurrage is one of the "other charges" authorized by section 2 of said act, and that the company is given a lien on shipments, for demurrage, as well as for freight, or other terminal charges. *Michie v. New York, N. H. & H. R. Co.* (C. C.) 151 Fed. 694.

This being an interstate shipment, the state law, of course, gives way to the federal statute, and by the Hepburn Act, *supra,* it is provided that the carrier shall provide and file, with the Interstate Commerce Commission, and print and keep open to public inspection, schedules, showing all rates, fares, and charges of transportation between different points on its own route and points on the route of any other carrier, and provides "that the schedule printed as aforesaid by any such carrier, shall plainly state the places between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately all *terminal charges, storage*

*charges, icing charges, and all other charges,* which the commission may require, etc." (Italics ours.)

The railway company, at the trial, offered, and the same was admitted by the court as evidence, the interstate tariff kept on file at its office in Oklahoma City, and also showed that it had been filed with the Interstate Commerce Commission as required by section 2 of the Hepburn Act. *supra.* The existence of the tariff, the filing of the same with the Interstate Commerce Commission, and the keeping of two copies at the depot in Oklahoma City as required in the Hepburn Act, are not in any manner denied by plaintiff. The reasonableness of these interstate charges, as shown by these tariffs, cannot be here inquired into. If the rates therein embodied are excessive, unfair, or unreasonable, complaint must be made to the Interstate Commerce Commission, which has exclusive jurisdiction, in the first instance, to inquire relative thereto. By the terms of said tariff, which is practically the same as the old car service rules, it is provided that, "after the expiration of the free time allowed, a charge of one ($1.00) dollar per car for each twenty-four (24) hours or fraction thereof shall be made and collected for the detention of all cars held for loading or unloading or subject to orders of consignors, consignees, or their agents." It is admitted that the cars were in use for a period of time longer than the 48 hours of free time after the same had been spotted for unloading. It is also admitted that the charges were properly made under the tariff above referred to, but it is strenously insisted that after having spotted the cars and delivery thereof, for the purpose of unloading same, no lien on the lumber in the cars could be enforced for the demurrage due, even though the demurrage be lawfully charged. It is true that the statute does not, in specific terms, provide a lien for demurrage charges, or furnish a method for foreclosing the same; but, without doubt, the great weight of authority is to the effect that a carrier has a lien for demurrage, as well as freight.

Counsel for plaintiff in error cites section 1570, vol. 4, Elliott on Railroads, as authority that a connecting carrier has no lien

for charges on freight received from another or initial carrier. We cannot agree with this construction. That section reads:

"It is well settled that a carrier is entitled to a lien upon the goods transported by it to secure the freight which is justly due for their transportation, * * * but, a connecting carrier which receives goods, with notice that the freight has been paid in advance for through transportation, or that the goods have been wrongfully diverted to its route, is not entitled to a lien."

The author had in mind freight which could be, and had been, paid in advance, and not demurrage. Demurrage cannot· be paid in advance, for it is not to be supposed that there will be demurrage in any case. Demurrage is a penalty imposed for failure to perform a duty. Consignees are supposed to unload cars as soon as practicable, and within the 48 hours' free time, but if, for any reason, the cars are not unloaded within that time, then a penalty, called "demurrage," is imposed.

The reason for the imposing of charges in the form of demurrage are many, and have been fully and succintly set forth by Judge Toney in *Kentucky Wagon Mfg. Co. v. Ohio & M. Ry. Co.,* 98 Ky. 152, 32 S. W. 595, 36 L. R. A. 850, 56 Am. St. Rep. 326, as follows:

"Without the right of making and enforcing reasonable rules and regulations as to the delivery of freight and the detention of their cars by consignees, railroads would be at the mercy of individual shippers. In order to fulfill the chief end of their creation, viz., the service of the public as common carriers, they should be left free to establish general and reasonable rules and regulations governing the delivery of freight and charges for the unnecessary or unreasonable detention of their cars by consignees. It is a matter of the highest public interest that they should be accorded this right and power. Individual convenience should be subordinate to the public good, which demands expedition, regularity, uniformity, safety, and facility in the movement of the freight of the country, which must of necessity be materially obstructed if individual consignees are allowed without let or hinderance, to convert freight cars on their arrival with cargoes of freight upon their side tracks into warehouses for the storage of freight at the suggestion of their convenience or interest. As we have seen, railroads are a public necessity;

the general welfare of the country being dependent upon their untrammeled inter-connection, and untrammeled liberty to accomplish the legitimate public purposes of their organization. Promptness, regularity, and safety in the transportation of passengers and freight are essential requisites to the successful administration of the railroad common carrier's system of the country. These characteristics or qualities are demanded by the public interest. Regularity and system in the movement of their cars, in the handling of freight, both in receiving, transporting, and delivering it, so that the public can know what to expect and what it can depend upon, are demanded of railroads by law and by public policy. But how can this be expected of railroads if their rolling stock may be tied up and water-logged upon the private side tracks and switches of private consignees to serve as storerooms and warehouses for their freight, without any power on the part of the railroad companies to enforce reasonable rules against such consignees, requiring diligence in the unloading and redelivery of their cars? These public carriers rely upon the rolling stock to meet the demands of the volume of business which they have to carry. How can they insure to consignees and shippers in general, and to the public, that facility of commercial interchange which they are required to afford both by charters and by public law? How can they furnish cars and transportation to shippers in general, and discharge the volume of traffic business of their respective systems, if their rolling stock can be locked up in the private yards of special consignees? How can such carriers know with any reasonable degree of certainty whether their rolling stock at any given time is or will be fully up to the demands of the business along their lines? Promptness, uniformity, and safety in the railroad traffic business of the country can only be secured by the adoption and strict enforcement by railroad companies of uniform and reasonable rules and regulations, which shall be binding upon all shippers and consignees alike, with reference to the reception, transportation, and delivery of freight. These qualities in railroad administration it requires no philosopher to see are indispensable to the proper accommodation and service of the interests of the public; and it should be the leading principle of action with all railroad managers to adopt and impartially enforce such rules and regulations as will most effectually secure these desired ends for the public."

Section 1567, Elliott on Railroads, treats of this subject as follows:

"It has been said that the right to demurrage exists only in maritime law, and is confined to carriers by water. But, while it is probably true that this right is derived by analogy from the maritime law as administered in America, the more recent authorities have almost unanimously upheld the right of railroad companies to make demurrage charges in proper cases. As said by one of the courts, 'we see no satisfactory reason why carriers by railroads should not be entitled to compensation for the unreasonable delay or detention of their vehicles as well as carriers by sea.' After a carrier has completed its services as such, it has a right to charge extra compensation for storing the goods in a warehouse and keeping them after the consignee has had a reasonable time in which to remove them. Why, then, when its duties as a carrier have been performed, and a reasonable time has elapsed, is it not as much entitled to additional compensation for the use of its cars and tracks as for the use of its warehouse? Certainly a customer whose duty it is to unload or who unreasonably delays the unloading of a car for his own benefit ought not to complain if he is made to pay a reasonable sum for the unreasonable delay caused by his own act. But this is not all. The public interests also require that cars should not be unreasonably detained in this way. Railroad companies as common carriers are 'bound to furnish cars for transportation of freight, and they must have control over their cars in order to perform their duties to the public. A car in motion is a useful thing, but a car standing idle and unloaded on the track is useless, and an incumbrance. If A. be allowed to hold a car unloaded (or loaded) at his pleasure or convenience, and thus deprive the railroad company of the use of its vehicles for transportation of the freight of B., it is obvious that both the railroad company and the public will suffer injury.' It is also well settled that common carriers may make reasonable rules and regulations for the convenient transaction of their business. It follows, from this line of reasoning, that railroad companies may adopt and enforce general rules, which are, or ought to be, known to their customers, making a reasonable charge for the unreasonable detention of their cars. In a number of cases a charge of $1 a day for the detention of a car after the lapse of 48 hours, Sundays and legal holidays excepted, has been held not to be unreasonable as a matter of law."

In *Railroad Co. v. George*, 82 Miss. 710, 35 South. 193, it is said:

"It is admitted that the amount charged under the demurrage rules is reasonable, and it appears to us that the rules, so far as applicable to this controversy, in themselves are fair, and based upon that fundamental maxim of justice. 'The greatest good to the greatest number.' The carrier of freight is responsible in damages if it unreasonably delays the transportation of freight delivered to it, and exact justice demands equal diligence of the consignee. When freight has been transported to its destination and the consignee legally notified of its arrival, it then becomes the duty of the consignee to promptly receive the same, so that the car may again be placed in service. These rules work no hardship to the consignee who displays proper diligence in the handling of his freight. Ample time is granted him. But they prevent the dilatory dealers, who seek to save storage or warehouse charges, from keeping the tracks blocked with idle cars; thereby impeding the carriers in the prompt handling of freight, and depriving other dealers of the use of necessary cars to haul their freight or transport the products of the country to market. Certainly no reason, founded in justice, can be given why consignees should not pay for any unreasonable or unnecessary detention of cars. Prompt handling of freight by both carrier and consignee is for the best interests of both, and of the commercial world at large. This question was never before in this court, but this view is in full accord with an almost unbroken line of decisions in other states; and, precedent aside, it is supported by justice and right."

The authorities are practically unanimous in holding that a carrier has a lien on goods for freight. We can see no difference in principle between a lien for freight and one for demurrage. There seems, however, to be some conflict in the decisions on the subject; yet a close examination will disclose that the conflicts are more apparent than real. Thus in *Nicoletti Lumber Co. v. People's Coal Co.*, 213 Pa. 379, 62 Atl. 1060, 3 L. R. A. (N. S.) 327, 110 Am. St. Rep. 550, 5 Ann. Case 387, it is held that there can be no lien in the absence of a specific agreement to that effect. To the same effect, see, also, *East Tenn. & C. R. Co. v. Hunt*, 15 Lea (Tenn.) 261. But, to the contrary, see *Southern R. Co. v. Lockwood Mfg. Co.*, 142 Ala.

322, 37 South. 667, 68 L. R. A. 227, 110 Am. St. Rep. 32, 4 Ann. Cas. 12; *Pittsburg, C., C. & St. L. Ry. Co. v. Mooar Lumber Co.,* 27 Ohio Cir. Ct. R. 588; *New Orleans & N. E. Ry. Co. v. George, supra; Miller v. Mansfield,* 112 Mass. 260; *Darlington v. Missouri, etc., Ry. Co.,* 99 Mo. App. 1, 72 S. W. 122; *Schumacher v. Chicago, etc., Ry. Co.,* 207 Ill. 199, 69 N. E. 825; *Barker v. Brown,* 138 Mass. 340; *Schmidt v. Blood,* 9 Wend. (N. Y.) 268, 24 Am. Dec. 143, and note; *Steinman v. Wilkins,* 7 Watts & S. (Pa.) 466, 42 Am. Dec. 254, and note; *Alden v. Carver,* 13 Iowa, 253, 81 Am. Dec. 430; *Kan. Pac. R. Co. v. McCann,* 2 Wyo. 3.

The above cases had to do with charges imposed by car service association rules, which consisted of a voluntary association of railways, for the purpose of making fair and reasonable charges, and which was designed, not only to protect the various railways, but shippers as well, and tended to produce uniformity of charges. Since the passage of the Hepburn Act, *supra,* these matters can be better cared for by the interstate tariffs exacted from the carriers by the Interstate Commerce Commission, and, as has been hereinbefore mentioned, these tariffs embody all the essential terms and rules of the former car service associations, and the point made by plaintiff in error that there is no evidence in the record as to any car service association rule is not, therefore, well taken, in that no attempt was made to prove such rules, but the tariff introduced in evidence was an embodiment of the essentials of such car service associations, and should be construed accordingly.

"The mere failure to refer by number to a car service tariff in the tariff rates can in no way relieve a shipper from the payment of demurrage." (*Cudhay Packing Co. v. Chicago & N. W. Ry. Co.,* 12 Interst. Com. Com'n R. 446.)

This brings us to the last proposition relied upon by plaintiff, to wit, the lien, if any there was, has been waived by the railway company, by delivery of the cars to consignee. Counsel quotes from section 1572, Elliott on Railroads, as follows, "The

lien of the carrier is lost by an unconditional delivery or voluntary surrender of the goods upon which it was held," and cites many cases in support of that theory. We concede the correctness of the above rule, but insist that the same is wholly inapplicable to the case at bar for that here there was no *unconditional* delivery, but only a qualified delivery instead. The mere fact that the railway company spotted the cars on the private switch and permitted plaintiff to enter thereon and unload a portion of each, under the facts and circumstances of this case and the nature of the business, was not such a complete delivery of the lumber as would prevent a seizure of the balance left in the cars, to enforce a lien. In other words, the railway company had a right to presume that the cars would be unloaded within the free time; both parties knew the contents of the tariff which provided for the demurrage charges after the expiration of 48 hours, and from the very nature of the business the company was bound to deliver possession for at least that time for the purpose of unloading, and before any lien existed; after the free time had elapsed, the lien was created, and the company had the right to take possession of the cars for the purpose of enforcing the same. Without this right, the lien, under such circumstances, would be of no value whatever, and as was said in *Railroad Co. v. George, supra*:

"There is no force in the argument which concedes the right of the carrier to make demurrage charges, but contends that the goods must be delivered, and then the carrier sue for the amount. This course would give the dishonest and insolvent an unfair advantage, and would breed a multiplicity of suits."

This identical question was considered in the case of *Southern Ry. Co. v. Lockwood Mfg. Co.,* 142 Ala. 322, 37 South. 667, 68 L. R. A. 227, 110 Am. St. Rep. 32, 4 Ann. Cas. 12, where Dowdell, J., speaking for the court, says:

"The foregoing authorities fully sustain the doctrine of the right of the carrier to a lien upon the goods transported for demurrage charges. Coming then to the main question in the case before us: Was the placing of the car of lumber on the 'team track' of the railway company for the purpose of being unloaded

by the consignee such an absolute and unqualified delivery of the lumber into the possession of the consignee as would cut off any future right of lien for legitimate charges for car service, or demurrage, subsequently accruing? We think not. The delivery of the possession of the lumber, in the manner in which it was made, and under all the conditions and circumstances, was a qualified delivery. The delivery was conditioned upon the lumber being unloaded from the car within a fixed time, and upon a failure of the consignee to comply with this condition additional rights and liabilities between the parties arose. The right of the consignee's possession of the lumber was accompanied with the duty on his part to remove the same from the car. It would hardly be contended that the placing of the car for the purpose of unloading terminated all liability of the railway company both as carrier and warehouseman while the lumber yet remained on its car. Upon the same principle that a railroad company, when its relation becomes that of a warehouseman, has a lien upon goods for storage charges, it has a lien upon goods for demurrage, or car service. * * * The indefinite detention of cars by shippers would naturally tend to impair the ability of the carrier to meet the demands of commerce and lessen the facility of transportation. The case of *Lane v. Old Colony & Fall River R. Co.,* 14 Gray (Mass.) 143, is somewhat similr in principle to the case at hand. In that case the railroad company had placed a shipment of coal in a bin on the company's ground to be removed by the consignees, and, after a part had been hauled away, the consignees refused to pay the freight and storage charges. It was held that the railroad company still had a lien on the coal which had not been hauled away for such charges. We think in principle there can be no difference between a delivery of the coal in a bin to be taken and hauled away by the consignee, and a delivery of the lumber on the car on the railway company's 'team track' for a like purpose. Our conclusion is that a lien for the subsequent charges for car service attached to the lumber in favor of the railway company."

The quotation from Rapalje & Max. Dig. of Railway Law, vol. 2, sec. 252, p. 107, which appears on page 18 of plaintiff's brief, does not hold to the contrary. It is there held that a railway company is *released from liability for any loss by fire* that may occur while unloading goods from the car, when a sealed car has been placed on the switch at request of the owner

of the goods, who had surrendered the bill of lading, paid the freight, and opened the car themselves, and was removing the goods. It does not in any wise support the contention of the plaintiff.

Having thus disposed of these various questions, it necessarily follows that the judgment of the lower court should be affirmed.

By the Court: It is so ordered.