YAZOO & MISSISSIPPI VALLEY RAILROAD COMPANY *v.* CHARLES J. SEARLES.

1. TRUSTS AND COMBINES. *Code* 1892, § 4437. *Laws* 1900, *ch.* 88, *p.* 125. *Contracts. Construction.*

In determining whether a contract violates public policy as evidenced by the anti-trust statutes (Code 1892, § 4437; Laws 1900, ch. 88, p. 125), the courts will consider the nature of the business contemplated and the tendency of the contract as affecting the public, rather than the nature of the parties, whether corporations or individuals.

2. SAME. *Test of a trust.*

All combinations or contracts, without regard to their purpose, intent, or effect, by which the control of business is placed within the power of trustees or persons other than the contracting parties, are not trusts within the meaning of the statute, Code 1892, § 4437, Laws 1900, ch. 88, p. 125, defining trusts and prohibiting contracts in restraint of trade, but the test of a trust and the essential of its existence is that the contract or combination be on account of its actual results obnoxious to public policy, or be in itself and in its necessary effect inimical to the public welfare.

3. SAME. *Forms not controlling.*

Courts will look through the form of an association in order to ascertain its character, and will judge of its nature not merely by its promulgated rules, but by its actual operation, and will decide the question of its legality or illegality according to the true nature and probable effect of the arrangement, without special regard to the form which has been assumed in the particular instance.

4. SAME. *Rules.*

If the form of a combination is legal, and its aim and purposes such as the law will uphold, it will not be denounced as illegal from the fact alone that the objects for which it was entered into are occasionally effectuated by rules which are only invoked as it becomes necessary to cope with unforeseen contingencies as they arise.

5. SAME. *Practical operation.*

Where a contract or understanding is not of itself inimical to the public welfare or in contravention of express statute, it will be upheld unless it is so operated as to become oppressive by infringing upon the rights of private individuals, or unless it works to the detriment of the general public.

6. SAME. *Car service associations. Failure to pay. No service.*

A rule of a car service association, providing that where consignees refuse to pay, or unneccessarily defer settlement of, car service charges, cars will not be switched to the private sidings of such persons, but deliveries will only be made on public delivery tracks of the company, is legal and enforceable.

7. SAME. *Refusal to pay. Unadjusted claim.*

The fact that a consignee has an unadjusted claim for damages against a railroad is no valid excuse for his refusal to pay demurrage on cars unduly detained by him.

8. SAME. *Reasonable orders. Wrongful enforcement.*

Where an order of a car service association is reasonable in its general tenor and effect, the question whether it was rightfully invoked in a particular instance does not affect the question of whether the association is or is not a trust or combine.

9. SAME. *Railroads. Extra services. Extra charges.*

Railroads are entitled to charge and receive extra compensation for extra service rendered after the arrival of freight at its destination, such as reconsignment charges, car service or switching charges, demurrage, and the like.

10. SAME.    *Lawful agreement.    Unlawful use.*

An agreement, lawful in its character and purpose, is not rendered unlawful because some of its members attempt to put it to an unlawful use.

11. SAME.    *Facts considered.    Course pursued not arbitrary.*

A rule of the railroad commission forbids railroads to discriminate in demurrage rates, and requires them to collect demurrage at all places on their lines if they collect at any place. The operation of the rule is to be suspended by the commission when justice demands. Other rules of the commission regulate car service associations. Prior to the promulgation of the latter set of rules, a car service association had a rule providing for the withdrawal of service on private sidings in case of the failure of consignees to promptly settle bills for car service charges. Under these rules, where a consignee refused to recognize the car service association, and refused to pay car service or demurrage, the withdrawal of car service on his siding by the car service association did not constitute such oppressive and arbitrary action as to constitute the car service association an illegal trust and combine or criminal conspiracy inimical to the public welfare.

12. SAME.    *Evidence of legislative intent.    Laws 1898, ch. 82, p. 97.*

The fact of the enactment of Laws 1898, p. 97, ch. 82, making car service associations subject to the control and supervision of the railroad commission, is indicative of a legislative intent that such associations shall not be deemed within the inhibition of Code 1892, § 4437, defining trusts and declaring them illegal, or Laws 1900, p. 125, ch. 88, which accomplishes the same purpose.

13. SAME.    *Laws 1900, ch. 88, p. 128, sec. 7.    Proof.*

Under Laws 1900, p. 128, ch. 88, sec. 7, providing that proof that a party has been compelled to pay more for services by reason of the unlawful act or agreement of a trust than he would have been compelled to pay except for such unlawful act or agreement shall be conclusive proof of damage, mere proof that one has been compelled to pay more for a service than his competitors were paying for the same service, without proof that such excessive payment was due to the alleged wrongful act and agreement complained of, does not constitute the required proof of damage.

14. SAME.    *Car service association.    Not a trust.*

A car service association, which is merely the agent of different railroads in the enforcement of car service and demurrage

charges, and which is not only without power to control the railroads intrusting their business to it, but cannot even fix the demurrage charges which it is its duty to assess, is not an illegal trust or combine, within the prohibition of Laws 1900, p. 125, ch. 88, defining such trusts as combinations or agreements by which any other persons than the contracting parties and their proper officers or employes shall have the power to conduct the control and management of their business.

15. SAME. *Bills of lading. Rules contained in.*

Rules contained in bills, of lading, imposing demurrage for dilatory unloading of cars, are binding upon consignees, though they be in fact ignorant of their existence.

16. SAME. *When railroad may refuse service.*

While it is the duty of a railroad to switch and place cars coming from its own line, or tendered to it with proper transfer switching charges by any connecting line, and it cannot excuse itself from the performance of its duty by the existence of disputes as to the correctness of charges withheld pending adjustment, yet it is warranted in refusing to switch and place cars at the warehouse of a consignee who has not only arbitrarily refused to pay demurrage charges accrued in the past, but has expressed his intention of persisting in his refusal even if such charges be justly incurred in the future.

17. SAME. · *Rule for collection of demurrage.*

A car service rule requiring prompt payment of demurrage charges and providing that no claim of mistake or overcharge will be considered unless the bill for demurrage is first promptly paid, does not subject consignees to a liability to imposition in the collection of demurrage, but leaves them free to prosecute actions for damages for the collection of overcharges or for refusing to render services when no demurrage is due or payment thereof has not been unduly delayed.

18. SAME. *Assessment of demurrage. Burden of proof.*

In a suit by a consignee for damages for extorting excessive demurrage charges or for withholding car service under a pretended claim for demurrage the burden is on the carrier to prove the proper assessment of unpaid demurrage, and that payment thereof had been refused or unduly delayed, within the terms of a rule requiring the prompt payment of demurrage charges.

19. SAME. *Account for demurrage.*

The fact that a bill for demurrage charges due a railroad was made out by direction of a car service association, to which the

railroad intrusted its business in the collection of demurrage, and on its letter heads, does not justify the consignee in refusing to pay such demurrage.

From the circuit court of Warren county.

Hon. George Anderson, Judge.

Searles, the appellee, was plaintiff, and the railroad company, the appellant, was defendant in the court below. From a judgment in plaintiff's favor for $60,861.30 and costs, the defendant appealed to the supreme court. The opinion states the facts.

*Smith, Hirsh & Landau, Mayes & Longstreet,* and *Blewette Lee,* for appellant.

*McLaurin, Armistead & Brien, Green & Green,* and *Claud Pintard,* for appellee.

[The briefs of counsel were withdrawn or lost from the record before it reached the reporter, hence no synopsis of them is given.]

Truly, J., delivered the opinion of the court.

Stated in chronological sequence, the facts giving rise to this litigation are as follows:

On October 1, 1900, under the firm style of Searles Bros., C. J. Searles and T. M. Searles commenced business in Vicksburg, Miss. At that time, and for several years before then, the delivery of cars and the assessing of demurrage for detention thereof by consignees of freight had been under the direction of the Louisiana Car Service Association, of which N. S. Hoskins was manager. Of this car service association both the railroads entering the city of Vicksburg were members. On December 8, 1900, C. J. Searles, the managing partner of the firm of Searles Bros., wrote to N. S. Hoskins requesting leniency on the part of the car service association in consideration of his promptness in handling the largest part of his business and in view of the fact that he was then laboring under the disadvan-

tage of not being able to secure an available warehouse in which to unload freight which might be consigned to his firm in carload lots. From this date until April, 1902, the record fails to disclose any variance in regard to the question of demurrage or car service between the firm of Searles Bros. and the car service association, or either of the railroads over which that firm received freight. From April until August 28, 1902, C. J. Searles, doing business as Searles Bros. and as successor to the Southern Brokerage Company, positively refused to pay any more car service or demurrage charges, and announced his deliberate determination not to recognize in any manner the authority of the car service association or its employes to assess said charges, and refused to have any conference in regard thereto with the manager or the local agent thereof. Frequent overtures were made to Searles by representatives both of the railroads and of the car service association seeking to arrive at some amicable adjustment of the pending dispute in reference to car service charges previously accrued, conditioned only that Searles would in the future recognize and comply with the rules of the car service association in reference to demurrage charges. All propositions of settlement or of arbitration were rejected by C. J. Searles, who firmly adhered to his announced decision of not recognizing the authority to any extent of the car service association. While this condition of affairs existed, on August 28, 1902, after first submitting the proposed order to the division superintendent of the Yazoo & Mississippi Valley Railroad Company, and receiving his approval thereof, N. S. Hoskins, manager of the Louisiana Car Service Association, directed that no cars should thereafter be switched to the warehouse where Searles Bros. and the Southern Brokerage Company transacted business or businesses. This warehouse, which Searles had secured subsequently to the writing of his letter to Hoskins, hereinbefore referred to, was located on a spur belonging to the Yazoo & Mississippi Valley Railroad Company, on which were also situated the warehouses of nearly all of Searles Bros.' chief

competitors in the business in which all were engaged—wholesale produce, commission, and brokerage. For many years it had been the custom of the Yazoo & Mississippi Valley Railroad Company to switch freight received in car loads to the warehouses of the consignees. After October, 1902, C. J. Searles continued business as successor of the Southern Brokerage Company; managing partner of Searles Bros., composed of himself and his brother, T. M. Searles; and as C. J. Searles & Co., composed of himself alone. All these businesses were conducted at the same warehouse, and the refusal to switch cars or freight applied to all alike. From August 28, 1902, the date of the issuance of the order declining to further switch cars, until March 9, 1903, the Yazoo & Mississippi Valley Railroad Company, acting under said order issued by the manager of the car service association, with the approval of its superintendent, uniformly refused to place cars of freight at Searles' warehouse, but continued as theretofore to switch all freight in car-load lots to other merchants engaged in similar business occupying warehouses similarly located. The Yazoo & Mississippi Valley Railroad did, however, furnish to Searles, upon request, empty cars for the shipment of freight from his warehouse to other points, and did, with one exception, transfer all cars received over its road to the Alabama & Vicksburg Railway when so directed by Searles. On March 9, 1903, the chancery court granted to Searles a mandatory injunction commanding the Yazoo & Mississippi Valley Railroad Company to switch and place at Searles' warehouse freight received in car-load lots in the same manner that it did freight received for his competitors in business also occupying warehouses. Pending this suit, and prior to final hearing, an agreement was entered into, by which Searles and the railroad company each agreed to pay any demurrage which might fall due thereafter under the rules governing that matter, such payment to be without prejudice to the rights of either party in the pending litigation. Thereupon C. J. Searles, in the name of C. J. Searles & Co., filed his declaration in the

circuit court against the Yazoo & Mississippi Valley Railroad
Company, claiming that between the date of August 28, 1902,
when first refusal to place cars was made, and the date of the
filing of the suit, the Yazoo & Mississippi Valley Railroad had
received over its own line, and refused to switch and place at
his warehouse, or had refused to receive from the Alabama &
Vicksburg Railway and switch and place at his warehouse, one
hundred and thirty-five cars of freight in car-load lots, by reason
of which action he had been compelled to receive his freight
on the wagon and delivery tracks of the Yazoo & Mississippi
Valley Railroad, all some distance from his warehouse, entail-
ing on him an additional expense, for labor, draying, and extra
clerk hire, of $1,905.05; and he also claimed in his declaration
a statutory penalty of $500 for each car load of freight which
the railroad had refused to switch and place at his warehouse,
averring that the railroad and the car service association had
discriminated against him; that the car service association was
a "trust" or "combine" within the meaning of the Mississippi
statute in that regard, whereby he was entitled, as the injured
party, to receive the penalty allowed under the statute.   The
case was tried before the circuit judge, a jury being waived.
In addition to the foregoing facts, it developed upon the hearing
that Searles alone of all merchants in Vicksburg engaged in
similar business refused to recognize the authority of the car
service association; that, while disputes over bills had from
time to time arisen between other merchants and the railroads
in reference to the correctness of several assessments of de-
murrage charges, such disputes had been adjusted or were in
process of adjustment, and that no order had been issued re-
fusing to switch cars for any other merchant, though such order
had been threatened in several instances when the settlements
had been unduly delayed.   It is undisputed in the record that
cars would have been switched for Searles had he agreed to pay
demurrage charges when the same might rightfully accrue un-
der the rules of the car service association.   It was further in

evidence that the Louisiana Car Service Association operated solely in regard to the assessment of demurrage under rules in reference thereto adopted and promulgated by the Mississippi Railroad Commission, and that car service charges were not claimed except under the circumstances authorizing under said rules the collection thereof; that the order refusing to have cars switched and placed for Searles was issued, not by order of the executive board of the car service association or with its knowledge, but by its manager, after the same had been submitted to and approved by the division superintendent of the Yazoo & Mississippi Valley Railroad, and was issued solely for the purpose of enforcing compliance on the part of Searles with the rules of the Mississippi Railroad Commission, authorizing the collection of demurrage under certain stated circumstances. The circuit judge held that the car service association was a trust and combine within the meaning of ch. 88, p. 125, Laws 1900, and awarded Searles damages in the sum of $60,861.30, being the statutory penalty for each car of freight which the railroad had refused to place at his warehouse, and, in addition thereto, the amount paid out for the drayage and handling of the freight contained therein. From this judgment the Yazoo & Mississippi Valley Railroad Company appeals.

The first question presented for consideration in arriving at a decision in this case is: What is a "trust" or "combine" within the meaning and condemnation of the statute cited? A determination of this question necessitates a brief examination, at least, of the history of anti-trust legislation in our state.

Section 198, Constitution 1890, commands the legislature to "enact laws to prevent all trusts, combinations, contracts, and agreements inimical to the public welfare." It must be observed at the outset that not all trusts, combinations, contracts, and agreements were to be prohibited, because the great lawmakers who framed the fundamental law of this commonwealth as the same is embodied in our present constitution well knew that such legislation would be palpably trenching upon, if not abso-

lutely violative of, the inherent rights of the citizen, and would
be restrictive to an unwarranted degree of the privilege of con-
tract which every man is entitled to enjoy under our form of
government. Tiedeman, Lim. Police Powers, sec. 244. No such
legislation was authorized, because no such legislation was de-
manded. Only such trusts, combinations, contracts, and agree-
ments were to be prevented as would be "inimical to the public
welfare." Acting under this authority, Code 1892, § 4437, was
adopted, providing that a trust or combine is a combination,
contract, understanding, or agreement, expressed or .implied,
between two or more persons, corporations, or firms and associa-
tions of persons, or between one or more of either and one or
more of the others, to do certain things therein enumerated—
amongst others, "(g) to place the control, to any.extent, of busi-
ness, or of the products or earnings thereof, in the power of
trustees, by whatever name called; (h) by which any other per-
son than themselves, their proper officers, agents, and employes,
shall, or shall have the power to, dictate or control the manage-
ment of business." And having enumerated the various kinds
of contracts which were denominated trusts and combines, the
section proceeds to declare them to be "inimical to the public
welfare, unlawful, and a criminal conspiracy." An analytical
study of this section demonstrates that it was the legislative
design to prohibit and provide punishment for the formation of
any criminal conspiracy by which the interest of the public
might be in any manner injured or jeopardized, whether such
combination was intended to be in restraint of trade, to limit;
reduce, or increase the price or the production of any com-
modity, or to hinder competition in the importation, manu-
facture, transportation, sale, or purchase of any commodity, or
to do certain other enumerated acts, which would, in the judg-
ment of the legislature, prove prejudicial to the interest of the
public or any part thereof, or of any individual; the reason
for this legislation being—as is so aptly phrased by Whitfield, J.,
in *Insurance Company* v. *State,* 75 Miss., 24 (22 South. Rep.,

99)—that: "Conspiracies of this class are raised to the grade of felony, and pronounced obnoxious to the public policy of this state, and inimical to the public welfare, by reason of the great mischief they are known, of all men, to accomplish, as manifested by the course of legislation and decision the country over. Such trusts constitute one of the greatest menaces to public welfare known to modern times, and the legislature has wisely made them felonies and denounced this severe penalty against them." The design of the legislature was to protect the public, not to unlawfully restrict the transacting of business by either corporations or individuals. The various kinds of legitimate business rendered necessary by the multiform demands of public convenience, the manifold callings which are an incident of this progressive age, all demand that the individual right of contract shall be given full sway, conditioned only that the rights of the public and the welfare of the people and the public policy of the state shall be held sacred. Says Terral, J., in *Houck* v. *Wright,* 77 Miss., 483 (27 South. Rep., 617) : "The legislature, by the chapter on trusts and combines, did not intend to debar a person from conducting his own private business according to his own judgment." In this connection Whitfield, J., in *Insurance Company* v. *State, supra,* says: "It [the legislature] therefore prohibited any trust whose object was to place the control of any business in the power of trustees, where the effect of such trust should be to injure the public or any particular person or corporation in this state. Such legislation has become very general in the United States, owing to the pernicious results of such trusts." It appears, therefore, from these previously announced, well-considered, and strikingly accurate statements of the scope and purpose of the law by this court, that one of two things must exist in order to render a contract or agreement between two or more persons or corporations subject to the condemnation of paragraphs "g" and "h" of the act now under consideration: First, it must place the control to some extent of the business or of the products or

earnings thereof, or it must give the power to conduct or control the management of such business, to trustees or persons other than the proper officers, agents, or employes of the contracting persons or corporations; or, second, it must have the effect of injuring the public or some particular person or corporation in this state.

The correctness of the definition which recognizes that a "combine," to fall within the purview of the legislative design, must have as a constituent element either a violation of public policy in that it tends to create a monopoly or is in restraint of trade, or that it involves a delegation and abandonment of corporate powers and is inimical to the public welfare, is emphasized and made more manifest by reference to legislation dealing with this subject enacted subsequent to the adoption of Code 1892, § 4437, hereinbefore cited. The purpose of the legislature of this state, the object it had in view, the evil it sought to prevent, appear in the title, given in conformity to the constitutional requirements as setting forth the subject-matter dealt with, to ch. 88, p. 125, Laws 1900, which is the latest expression of legislative will. That act is entitled "An act to define trusts and combines, to provide for the suppression thereof, and to preserve to the people of this state the benefits arising from competition in business." And the same intention is again declared in sec. 11 of the act, which directs that it shall be liberally construed to the end that trusts and combines may be suppressed, and the benefits arising from competition in business preserved to the people of this state. The benefits which the legislature sought to secure to the people of the state were those which naturally flow from competition in business. In order to insure these benefits, it was provided that any contract entered into between two or more persons or corporations should be unlawful if it in any wise restrained or decreased the advantages known to arise from competition in business, whether such contract was expressly and openly in restraint of trade, or whether, by its effect, it was indirectly liable to reduce or in-

crease prices, to increase or reduce production, to engross or forestall or to hinder competition in production, manufacture, transportation, sale, or purchase of any commodity. All contracts, whether expressed or implied, which would necessarily or probably have any of the effects therein forbidden were declared to be violative of the announced public policy of the state in that they inevitably tended to reduce the benefits sought to be insured by the act. It was also forbidden for any two or more persons or corporations to issue, own, or hold the certificates of stock of any trust or combine. This provision was clearly aimed at the well-known plan by which the stock of various corporations, surrendering their own corporate entity, engaged in a partnership of their own, such arrangements being palpably in restraint of trade and tending inevitably to the creation of a monopoly. It was further provided by paragraphs "g" and "h" that it should be unlawful for two or more persons, firms, or corporations, or one or more of either with one or more of the other, to form any contract or combination by which the power to dictate or control the management of the business, or by which the control of the business or of the products and earnings thereof, was placed in the power of any other person than their own proper officers, agents, and employes. These paragraphs are a rescript of the provisions originally contained in sec. 4437, *supra.* It should be observed that these paragraphs, and in fact the whole chapter, deal with both corporations and individuals alike. And in construing such statutes the general rule is that the nature of the business contemplated by the contract or arrangement and the tendency of the contract as affecting the public, rather than whether the parties to the contract are corporations or individuals, are to be considered in determining whether it violates public policy. Hirschl., Combination, Consolidation, and Succession of Corporations, p. 2.

This consideration eliminates from this discussion the question of to what extent limitations upon the power to contract may be placed by the state upon corporations solely and only

in a proper exercise of 'its reserved police power.   When ana-
lyzed, the propositions contained in the paragraphs cited are not
novel.   They are, in truth, but mere announcements of familiar
principles contained in varying form in many statutes germane
to this subject.   They and all the provisions of the act are but
means to an end, details of the legislative plan.   The result
desired—the purpose of the entire legislation—was to suppress
trusts, secure the benefits arising from competition in trade,
prevent monopolies, and protect the people from the possible
tyranny and oppression of combined wealth.   In fact, a brief
investigation will show that all modern anti-trust legislation is
based upon the same fundamental principle.   All combinations
are forbidden the necessary, natural, or probable consequence
of which will be to increase or decrease the price of production
of any commodity, or which restrict facilities in the handling
or transportation of the same.   Contracts or agreements, of
whatever character, by which the autonomy of corporations is
surrendered and the exercise of their charter powers delegated
to others, are denounced as violative of public policy.   Corpora-
tions which enjoy no powers except those of which they are
recipients by charter grant are without power to absolve them-
selves from the performance of their duties to the public, and
contracts abnegating such performance and alienating the pow-
ers granted them by the state are void.   *Central Transportation
Co.* v. *Pullman Palace Car Co.,* 139 U. S., 24 (11 Sup. Ct., 478;
35 L. ed., 55); Ray, Contractual Limitations, p. 240.   Ar-
rangements, under whatever guise, by which the stock of several
distinct corporations is placed in the hands of certain trustees,
who are vested with power of voting it, are condemned as tend-
ing inevitably to the creation of monopolies and the absolute
destroying of competition in the production or transportation
of many commodities, and, as a direful result, a few individuals
would be able to fix the price of the very necessities of life, with
power to increase or decrease without regard to supply or de-
mand, but solely as their greed and rapacity might dictate.   The

wisdom of such legislation and the imperative necessity of its strict enforcement is evidenced by the fact that the aggression of mighty aggregations of corporate wealth so formed now constitute one of the gravest problems with which the nation has to deal. *Northern Securities Co.* v. *U. S.,* 193 U. S., 197 (24 Sup. Ct., 436; 48 L. ed., 698); *Pearsall* v. *Great Northern R. R. Co.,* 161 U. S., 646 (16 Sup. Ct., 705; 40 L. ed., 838). In short, without unduly extending these observations, the formation of all contracts and combinations is condemned by which corporations or individuals are banded together for any illegal purpose; or, if such association be already in existence, the parties will be inhibited from continuing operations thereunder.

But at last the test, and only test, is not what the intent of the parties may be, not what form the combination has taken, but what will its probable effect be? If unlawful or oppressive, if obnoxious to public policy, if inimical to public welfare, they will be denounced and punishment meted out to every participant; otherwise, courts will not limit or restrict the inalienable right of contract, and will not interfere unless the violation of law be apparent or the apprehended evil effect assume some tangible form. Noyes, Intercorporate Relations, secs. 392, 401, 405. We uphold and maintain in its full integrity the doctrine which recognizes the right of the state, in the exercise of its reserved police power, to restrict the power of corporations to contract within certain prescribed limits, and which forbids that such power should ever be so abridged or so construed as to permit corporations to conduct their business in such manner as to infringe upon the rights of individuals or the general well-being of the state. That power inheres in the sovereign, and the protection from the encroachments of corporations is assured by the guaranty of sec. 190, Constitution 1890. But that doctrine is not assailed here. This is a case involving not legislative power, but legislative will. In this direct connection it must again be observed that by the act now under review what is forbidden to corporations is likewise forbidden to individuals.

The contracts and agreements which are by paragraphs "g" and "h" condemned fall under the ban of the law, whether entered into by corporations solely among themselves, or jointly with individuals, or by several individuals alone.

It is contended that all combinations or contracts, without regard to purpose, intent, or effect, by which the control, to any extent, of business, or of the products and earnings thereof, is placed within the power of trustees, or by which other persons than the contracting parties or their proper officers, agents, or employes are given the power to dictate or control the management of business, are prohibited by the terms of the act. If this narrow construction is in fact the legislative intent, the entire law would be open to the just criticism of being a wholly unnecessary, if not an unwarranted, invasion of the inherent right of the citizen to deal with his own as he pleases, if without injury to others. *Gage* v. *State,* 24 Ohio Cir. Ct. R., 724. Carried to its logical conclusion, this argument would prevent any two or more individuals engaged in business from employing the same agents or representatives, or from placing in the hands of the same individual the right to control their separate businesses. So two planters, owning adjoining plantations, by employing the same manager to control both places, with power to manage the business, dictate to the laborers, and dispose of the products, would be guilty of a criminal conspiracy. Two jobbers who employ the same traveling salesman, with power to accept or reject orders to be transmitted to one or the other of the stores; or two merchants who employ the same drayman to haul and deliver their freight; or two express companies which employ the same messenger and deliveryman; or two railroad companies which employ the same ticket or freight agent at union depots; or two insurance companies which employ the same adjuster, with power to settle losses; or two lumber companies which employ the same attorney, with power to adjust disputed claims or impending litigation; and many other cases of everyday occurrence—would each be violative of the law now

under consideration, and every participant therein would be subject to the severe penalties therein prescribed. We cannot adopt or sanction this restricted view. The true interpretation, in our judgment, is that only such contracts and agreements (within the purview of the paragraphs now under review) are forbidden which, on account of their natural result, are obnoxious to public policy, or which, in themselves, are by necessary effect inimical to the public welfare. Practically the same construction has been placed upon the anti-trust laws of other states, which, though clothed in different verbiage, contain substantially the same ideas and are designed to attain the same end. Thus the supreme court of Montana in a very recent case, in discussing the constitutional and statutory provisions of that state relating to this matter, says: The constitution "deals generally with the rights and powers of corporations and associations of persons exercising any of the powers and privileges not possessed by individuals or partnerships and their duties and purposes. It is prohibitory and restrictive in its general scope and purpose, the design of the convention in adopting its provisions being to prevent combinations to restrict or repress competition in all industrial pursuits and to protect the people in general and the employes of a certain class against both the legislature and combinations of capital from unjust impositions." And after showing that certain consolidations, such as that of competing railroads, telegraph and telephone companies, and the like, are absolutely prohibited, "as having a necessary tendency to restrict competition," the court proceeds to a discussion of the anti-trust statute: "Apart from these wholesome restrictions and prohibitions, the right of the people to accumulate property and to hold and enjoy it, either by individual effort or by means of associations of natural or artificial persons, is not restricted. Section 20 prohibits any combination or contract which has a particular purpose—to wit, 'fixing the price or regulating the production of any article of commerce, or of the product of the soil, for consumption by the people.' The terms

'combine' and 'form a trust' were evidently intended to be read in connection with the expression 'for the purpose,' etc., clearly implying that, in order to subject offenders to the severe penalties which the legislature might impose, there must be shown a specific intent to do the prohibited act, or that the association or combination necessarily tends to accomplish the same result. That this is the meaning is clear from the enumeration of persons who may not do the prohibited acts. Corporations, stock companies, natural persons, and partnerships are all included. If the criminal intent is not a necessary ingredient of the evil denounced, then all sorts of combinations are to be deemed prohibited, even ordinary copartnerships, as coming within the letter of the prohibition; for the terms 'combine' and 'form a trust' are of equal dignity. If the former is to be regarded as modified and explained by the clause 'for the purpose,' etc., by the same rule must the latter also. The term 'trust' is assigned the meaning given to it by the text writers (Cook on Corp., sec. 503a; Spelling on Trusts, sec. 121), and includes any form of combination between corporations or corporations and natural persons for the purpose of regulating production and repressing competition by means of the power thus centralized." And after showing that the term was first used in a narrower sense and applied only to transfer of stock by several corporations to trustees, with power to vote, the court continues: "If it be construed as equivalent to the term 'combination' or 'consolidation,' the meaning of the section is perfectly clear; if used in the sense of the definition given it by the text writers, it is none the less clear, though it involves a repetition of the same idea, since the definition includes the idea of criminal purpose and makes it a necessary ingredient of the offense denounced. The section of the statute quoted involves the same idea and demands the same construction, though it is more specific in its provisions, and extends to and includes combinations in restraint of competition in transportation. It denounces every form of combination or contract which has for its purpose,

directly or indirectly, the restraint of production or trade in any way or manner, or the control of the price of any article of consumption by the people. It was not the purpose of the convention or the legislature to limit either the term used in the constitution or in the statute by any narrow definition, but to leave it to the courts to look beneath the surface, and, from the methods employed in the conduct of the business, to determine whether the association or combination in question, no matter what its particular form should chance to be or what might be its constituent elements, is taking advantage of the public in an unlawful way. *Harding* v. *Am. Glucose Co.,* 182 Ill., 551 (55 N. E., 577; 64 L. R. A., 738; 74 Am. St. Rep., 189). In each case, therefore, under these provisions, the nature of the arrangement or combination is a question of fact to be determined by the court from the evidence before it or from the vice which inheres in the contract itself." *McGinnis* v. *Boston & M. Consol. Copper & Silver Min. Co.* (Mont.), 75 Pac., 94; *Ceballos* v. *Munson S. S. Line,* 93 App. Div., 595 (87 N. Y. Supp., 811), and cases cited.

Nor is the rule of construction different when applied to the federal anti-trust statute. "It is now settled," says the circuit court of appeals, "by repeated decisions of the supreme court, that the test of the validity of a contract, combination, or conspiracy challenged under the anti-trust law is the direct effect of such a contract or combination upon competition in commerce among the states. If its necessary effect is to stifle competition or to directly and substantially restrict it, it is void. But if it promotes, or only incidentally or indirectly restricts, competition in commerce among the states, while its main purpose and chief effect are to foster the trade or enhance the business of those who make it, it does not constitute a restraint on interstate commerce within the meaning of that law, and is not obnoxious to its provisions. This act of congress must have a reasonable construction. It was not its purpose to prohibit or to render illegal the ordinary contracts or combinations of manufacturers, merchants,

and traders, or the usual devices to which they resort to promote the success of their business, to enhance their trade, and to make their occupations gainful, so long as those combinations and devices do not necessarily have a direct and substantial effect to restrict competition in commerce among the states." *Phillips* v. *Iola Portland Cement Co.,* 125 Fed., 594 (61 C. C. A., 19). And for an exhaustive and very lucid discussion of the same subject, in which the same result is reached, see the elaborate opinion in *Whitwell* v. *Continental Tobacco Co.,* 125 Fed., 454 (60 C. C. A., 290; 64 L. R. A., 689), supported by numerous extracts from opinions of the United States supreme court.

As the latest authoritative utterance upon this subject we quote from the opinion of the supreme court of the United States in *Northern Securities Company* v. *United States,* 193 U. S., 197 (24 Sup. Ct., 436; 48 L. ed., 698), where, among other propositions announced are plainly deducible from previous decisions of that court, which are reviewed, are the following, which embrace the case at bar: "That the natural effect of competition is to increase commerce, and an agreement whose direct effect is to prevent this play of competition restrains, instead of promoting, trade and commerce. That to vitiate a combination such as the act of congress condemns, it need not be shown that the combination in fact results or will result in a total suppression of trade or in a complete monopoly; but it is only essential to show that by its necessary operation it tends to restrain interstate or international trade or commerce, or tends to create a monopoly in such trade or commerce and to deprive the public of the advantages that flow from free competition." Justice Brewer, in his concurring opinion in that case, also speaking of the federal anti-trust statute, says: "That act, as appears from its title, was leveled at only 'unlawful restraints and monopolies.' Congress did not intend to reach and destroy those minor contracts in partial restraint of trade which the long course of decisions at common law had affirmed were reasonable and ought to be upheld. The purpose, rather, was to place a

statutory prohibition, with prescribed penalties and remedies, upon those contracts which were in direct restraint of trade, unreasonable, and against public policy. Whenever a departure from common-law rules and definitions is claimed, the purpose to make the departure should be clearly shown. Such a purpose does not appear, and such a departure was not intended. Further, the general language of the act is also limited by the power which each individual has to manage his own property and determine the place and manner of its investment. Freedom of action in these respects is among the inalienable rights of every citizen."

By parity of reasoning we think these observations strikingly applicable to our own statute. The object of the federal anti-trust statute is to preserve to the people of the entire nation the benefits arising from competition in business by preventing monopolies and contracts in restraint of trade in regard to commerce among the states. The object of the state legislation is to preserve to the people of the state the identical benefits by preventing monopolies and contracts in restraint of trade in regard to domestic commerce. To vitiate a combination such as the statute condemns, it is essential to show that by its necessary operation it tends to restrain trade or commerce, or tends to create a monopoly in such trade or commerce and to deprive the public of the advantages that flow from free competition, the trade or commerce so affected being domestic or interstate or foreign, according to whether the state or federal statute is invoked. But to vitiate the combination the effect must be detrimental to the interests of the public under either statute. An approved statement of the rule is this: "Combination for business purposes is legal. Combinations are beneficial as well as injurious, according to the motives or aims with which they are formed. It is therefore impossible to prohibit all combinations. The prohibition must rest upon the objectionable character of the objects of the combinations." Tiedeman, Lim. Police Powers, sec. 244. We adopt this announcement as accurate, with

the additional proviso that, if the effect of the combination be evil, it will be condemned, no matter how praiseworthy its object may have been.

We cannot convict the legislature of having intended to prohibit the very many and constantly increasing number of perfectly legitimate contracts or combinations to which the growth of business or the exigencies of commerce give rise, and which are constantly multiplied by new avenues continually being opened by the thrift, progress, and invention of this era of complex business enterprises. Keeping in mind the clear statement before quoted from *Insurance Co.* v. *State, supra,* that only such combinations are forbidden as may have the effect of injuring the public, or some part thereof, or some corporation or private individual, the meaning of the statute and of the paragraphs particularly in question becomes perfectly plain, and the plan inaugurated by the legislature stands out in bold relief in all its details.

With this interpretation of the statute we pass to the consideration of the question whether or not the Louisiana Car Service Association, as disclosed by this record, comes within the condemnation of any of the provisions of the anti-trust law as the same now exists in our state. It is not contended that a car service association does anything to diminish the benefits arising from competition in business which are sought to be secured to the public. It is manifest that not only is a car service association not any restraint to trade, but, on the contrary, by insuring or endeavoring to insure the prompt handling of freight after it has reached its destination, by increasing the facilities for transportation, by requiring the speedy unloading of cars so that the same may again be placed in use, it tends to increase competition in business, and facilitates the transportation of every commodity handled through the agency of railroads. The record discloses that as a public agency car service associations are a power for good in the line indicated, and in no manner hinder competition in the importation or the transportation of

any commodity. It is urged that a car service association, with the powers vested in it as shown by this record, falls within the scope and meaning of paragraphs "g" and "h" of ch. 88, p. 125, Laws 1900, in that it places the control, to some extent, of the business of the various railroads forming the association in the power of trustees, and permits other persons than their proper officials, agents, and employes to dictate or control the management of their business, and hence is such a combination as is forbidden by the statute referred to. In this connection it should again be observed that paragraphs "g" and "h" were first adopted in identical form in § 4437, Code 1892. At the date of their enactment car service associations were already in operation in many sections, including our own state. Since then their usefulness and the beneficial results which have followed from their operation have so demonstrated the advantage which they afford to both railroads and the public that at this time (so this record discloses) the railroads of the entire nation, with rare exceptions, are grouped into one or another of the many car service associations which now exist; so that in no part of the territory of these United States where car service associations are operating under reasonable rules and regulations, which are fairly, equitably, yet rigidly enforced, is it possible for the carrier to discriminate against the receiver of freight or for the consignee of freight to take an undue advantage of the carrier or of any competitor in business similarly situated. As originally devised, the demurrage charge which every car service association undertook to assess for undue detention of cars caused by dilatoriness in unloading the same by the consignee, the amount of *per diem* demurrage which could be levied, was solely within the discretion of the car service association. With this knowledge, and in order to prevent possible hardship by imposition of oppressive rates for demurrage, the legislature of our state, by ch. 82, p. 97, Laws 1898, wisely placed the car service association under the supervision of the State Railroad Commission. Recognizing the advantages which were incident to the operation of

car service associations, the legislature, by this thoughtful and timely action, secured these advantages to the public, and at the same time shielded and protected the people from any possible hardship which might be caused by the imposition of exorbitant rates for delay in unloading. Acting under the power thus vested in it, the railroad commission adopted and promulgated certain rules in reference to demurrage charges, regulating the amount which could be imposed and setting out in detail the circumstances under which they might rightfully be levied, and then clothed the associations with authority to collect in all proper cases. And the implied warrant for their continued existence and operation evidenced by this action of the railroad commission in thus assuming control of them and formulating rules and regulations for their government is suggestive that the commission deemed neither their form, purpose, nor operation pernicious in effect, or in any wise detrimental to the public interests. It should be observed that these rules affixing penalties for undue detention of cars were not devised for the benefit of railroad companies alone, but were framed by the State Railroad Commission, a tribunal charged by law with the duty of supervising all common carriers for the benefit of the public at large.

Nor is the force of the inference logically drawn from this action of the railroad commission weakened by the suggestion that the commission has never undertaken to supervise car service associations, but has studiously refrained from assuming the authority vested in it by the legislature, and has restricted the operation of its rules in reference to demurrage and car service charges to the railroads solely. This contention will not bear the test of investigation. That the railroad commission has assumed and is now exercising supervision of car service associations is made evident by an inspection of the rules adopted and formally announced by the commission and accepted and established by the Louisiana Car Service Association for its guidance in transacting its operations. It is true that these rules require the railroad company handling the freight to give.

notice of the arrival of the car; but this is a mere announcement of the law as it exists, irrespective of the rule. This is a duty imposed upon the carrier by the law, and its prompt performance is, by the rule, made a condition precedent to the collection of any demurrage charges. Car service associations have nothing to do with the handling of freight or the notifying of consignees of its arrival. Their services are only called into requisition after "legal notice," as defined by the rules, has been duly given the consignee. It is also true that the rules speak of the demurrage charges being collected by the railroads, but this is again in accordance with the established usage of such associations. Car service associations are simply agencies employed by railroad companies to insure prompt, accurate, and impartial asssessing of demurrage; but in each instance it is assessed in favor of the railroad entitled to it, and it is collected by that railroad, sometimes by the car service association of which it is a member, sometimes by some other of its various employes, according to the custom of the railroad in reference to its collections. But by rule 11 the railroad commission prohibits any charges for demurrage or storage being made except as permitted by its said rules. Rule 12 limits the operations of the rule permitting demurrage charges to "places where car service rules are in operation," thus tacitly acquiescing in and indorsing the enforcement of car service rules; while rule 13 in express terms recognizes the existence of car service associations by providing that demurrage shall be collected for the detention of "private cars" when the same are detained, presumably, even by the owners of the cars, on the tracks belonging to or operated "by members of this association." It is a fact fraught with significance that these rules were not adopted by the railroad commission until by legislative enactment power to supervise car service associations had been vested in it. Finally, a reference to the records of the commission definitely settles its intent beyond the peradventure of a doubt, for the resolution adopting the very rules now under consideration in express terms declares that the

rules are "adopted for the car service associations doing business in this state." And by resolution subsequently adopted car service associations were warned that "under authority conferred upon the railroad commission by ch. 82, Laws 1898," they were expected to make reports as the commission might direct. Record Book 3, pp. 149–164. It is manifest, therefore, that not only did the legislature intend to place car service associations under the supervision of the railroad commission, but that control was in fact assumed 'and exercised by the commission. We are forced, by these considerations, to the conclusion that this position of appellee is untenable.

The argument is strongly pressed that the Louisiana Car Service Association, by the manner in which it enforced its rules and regulations in the instant case, acted in such an unlawful or oppressive way as to put itself beyond the pale of the law, and deprived it of the rights and privileges granted by the rules and regulations of the Mississippi Railroad Commission. In addition to the rules regulating the collection of demurrage charges and stating the amount and circumstances under which the same might be collected, the railroad commission further provided: "Rule 9. No discrimination in charges allowed between persons or places. Railroads shall not discriminate between persons or places in storage or demurrage charges. If a railroad company collects storage or demurrage of one person, under the demurrage rules, it must collect of all who are liable. No rebate, drawback, or other similar device will be allowed. If demurrage is collected by the railroad company at one point on its line, it must collect at all places on its line of those liable under the rules of this commission. Provided, that the commission shall hear and grant applications to suspend the operation of this rule whenever justice shall demand this course." Without disobeying the express mandate of this rule, and thereby subjecting itself to the penalties prescribed by ch. 82, p. 97, Laws 1898, the Louisiana Car Service Association was without authority to refuse or neglect to collect demurrage from one merchant, when, under simi-

85 Miss.—35

lar circumstances and conditions, it demanded and received such charges from other merchants. This is forbidden, and most rightfully so, by the mandate of the railroad commission which gives to the operations of the car service association the sanction of its approval. Such favoritism would work discrimination of the grossest kind by giving to one merchant an unconscionable advantage over all competitors engaged in the same business. If a railroad or a car service association had the authority at its mere whim and pleasure to permit one merchant owning a warehouse on a side track to receive freight and keep it stored in its cars without demanding demurrage for their detention, while at the same time the collection of such charges was demanded and enforced of another merchant in the same line of business and owning a warehouse similarly located, it would place it in the power of the carrier by such arbitrary action to build up the one business and place a heavy burden upon the other. This rule was devised to prevent the possibility of such combination between carrier and merchant—an arrangement which would in truth be a "combine," with the inevitable and pernicious effect of decreasing the benefits arising from competition in business, because by building up one business and breaking down competition it would tend to create a monopoly for the benefit of the unjustly favored few. *American Warehousemen's Ass'n* v. *Railroad,* 7 Interst. Com. R., 556. An inspection of the rules of the railroad commission shows that the right at any time to suspend the operation of this rule whenever justice shall demand this course is expressly reserved, the object of this wise and thoughtful provision being, of course, that whenever, by reason of untoward or unforeseen circumstances, the imposition of demurrage charges would work a hardship or injury to any particular place or community, the rule could be suspended, so that what was designed as a benefit to the public cannot be converted into a weapon of oppression. In the instant case we find that during the entire period covered by this controversy demurrage was demanded and collected of

every other merchant doing business in the city of Vicksburg by whom it was rightfully due. We find further that Searles alone of all men engaged in similar business—and, so far as the record discloses, of all merchants in the city of Vicksburg—denied the power and authority of the car service association to impose and collect demurrage. Under such circumstances it was not only the right, but it was the duty, of the car service association, rep- resenting in this instance the Yazoo & Mississippi Valley Rail- road Company, to accord to Searles the same treatment which his competitors received. If on account of any special circum- stances—of which, however, the record gives no hint—the im- position of demurrage charges in the city of Vicksburg worked a special hardship, the parties aggrieved had an adequate remedy by applying to the railroad commission to temporarily suspend the operation of the rule. This appellee did not do, contenting himself by refusing to pay demurrage and hauling his freight from the public delivery track by drays. The fair and impartial collection of demurrage is expressly enjoined upon car service associations, and they are forbidden to administer and enforce their rules "with an evil eye and an unequal hand," so as to make the unjust discrimination between persons or places in similar circumstances.

In the extremely elaborate opinion of the trial judge it is said: "If, therefore, the question was, Do the published rules of the railroad commission, adopted by the car service association, and being, as Mr. Hoskins, the manager, says, the only rules they have, constitute them a trust and combine under our statutes ? probably plaintiff would have no standing in court. But it ap- pears from the conduct of the parties composing this association and the testimony of their manager, Mr. Hoskins, that they op- erate under two sets of rules—one the exoteric, or published rules in evidence, known to and for the benefit of the outside public, including the courts; and the other the esoteric, or the arbitrary and discretionary powers of the manager himself, known only to and for the benefit of those living within the inner circle, the

members of the association and its agents. It is the acts of the association under the latter rules that furnish the basis of this controversy, and which we are called upon to consider." And after an extended discussion the judge arrives at the conclusion that the Louisiana Car Service Association, by reason of its operation under certain unpublished rules, so called, has brought itself within the scope of our anti-trust statute. Applying settled principles of law to established facts, will this conclusion, in the light of this record, bear scrutiny? It is, of course, true that courts will look through the form to ascertain the character of any association, and will judge of its nature not merely by its promulgated rules, but by its actual operation as well, and will decide the question of its legality or illegality according to the true nature and probable effect of the arrangement, without special regard to the form which has been assumed in each particular instance. If an apparently innocent form is in truth but a disguise assumed to mask a sinister design, the court, disregarding the outward shape, will condemn the arrangement. This rule has the indorsement of the highest judicial authority. But it is equally as true that, if the form of the arrangement be legal and its aim and purpose such as the law will uphold, it will not be denounced, from the fact alone that the objects for which the agreement was entered into are occasionally effectuated by rules which are only invoked as it becomes necessary to cope with unforeseen contingencies as they arise. If the contract, understanding, or agreement be not of itself inimical to the public welfare, nor in contravention of express statute, it will be upheld, unless it be so operated as to become oppressive by infringing upon the rights of private individuals or unless it works to the detriment of the general public.

Making an application of these general principles to the concrete case here presented, we find that the Louisiana Car Service Association is one of a class of combinations the existence of which, in this state, is recognized by an act of the legislature; that the prime aim and purpose of similar associations has been,

by repeated adjudications of courts of last resort, upheld, and pronounced beneficial to public and carrier alike; that the rules for its government and for the transaction of its general, ordinary, and routine business are framed by the railroad commission, the tribunal invested by law with absolute power of supervision; that, if unexpected cases arise, not covered by the general rules, the manager of the association copes with such difficulties in his discretion until his action in the premises can be reviewed by the officials composing the executive board of the association. The legality and validity of the general rules of the association being vouched for by the action of the railroad commission, the question next presented is: Was the special order of August 28, 1902, refusing to switch cars for appellee, so unreasonable in its terms and such an oppressive act as to make the association a combination inimical to the public welfare, or was it the exercise of such power as showed that the Yazoo & Mississippi Valley Railroad Company had surrendered the control "to any extent" of its business so that persons other than its proper officers, agents, or employes had the power to dictate or manage the same? This is the pivotal question upon this branch of the case. After the most careful and protracted consideration, we have reached the conclusion that the special order referred to was not, under the circumstances of this case, discriminative or oppressive. It was in fact but the re-enactment and putting in force of a rule of similar import which was in force with the Louisiana Car Service Association prior to the promulgation of the present rules by the Mississippi Railroad Commission and their adoption by the association. The enforcement of this special order was nothing more nor less than an effort to carry into effect that rule of the railroad commission which requires the collection of demurrage from all alike who are subject thereto. The condition of affairs as it existed at that date amply justified the Louisiana Car Service Association in invoking the aid of the rule in question. That rule is as follows: "Rule 10, sec. 2. On deliveries to private sidings, in cases where consignees or

consignors refuse to pay or unnecessarily defer settlement of bills for car service charges, the agent will decline to switch cars' to the private sidings of such parties, notifying them that deliveries will only be made on public delivery tracks of company, and will promptly notify the manager of the action taken." In almost identical terms this rule was before this court for consideration in a case involving the right to collect demurrage, the reasonableness of the rules, and the power to detain freight to enforce payment of demurrage and car service charges. At that time, after thorough investigation, upon full presentation of the question, this court announced as its conclusion that car service associations were legal, their charges just and enforceable, their rules valid and reasonable. *Railroad Company* v. *George,* 82 Miss., 710 (35 South. Rep., 193); and see rule 3. We see no reason to withdraw from the position assumed in that case, which has been strengthened and fortified by several strong and well-reasoned decisions in other jurisdictions. *Railway Co.* v. *Dorsey Fuel Co.,* 112 Ill. App., 382; *Railroad Company* v. *Midvale Steel Company,* 201 Pa., 624 (51 Atl., 313; 88 Am. St. Rep., 836); *Schumacher* v. *Railroad Co.,* 207 Ill., 199 (69 N. E., 825); *Pennsylvania Millers' State Ass'n* v. *P. & R. Ry. Co.,* 8 Interst. Com. R., 531.

Did appellee, by his conduct, bring himself within the operation of this rule? For reasons which are apparent, and the justice of which is readily demonstrable, the rule under consideration says to the favored consignee having a warehouse on a private siding: "If you will pay demurrage and car service, you can enjoy the advantage of having your car-load freight delivered at your warehouse; but if you refuse to pay or unnecessarily defer paying for such service, you must get your freight at the public delivery track, as do less favored consignees." Appellee refused to recognize the car service association, refused to comply with its rules, refused to pay demurrage charges, without knowledge and without inquiry as to their justness or correctness and without reference to what representative of the appel-

lant sought to collect them, planting himself squarely on the ground that he would not allow the car service association to in any manner concern itself with the handling of his freight. It is suggested in argument that the reason of these repeated refusals was because appellee had an unadjusted claim for damages to a car of corn, but the record shows that the dispute about the corn arose long subsequent to the issuance of the order refusing to switch cars for appellee. But, even if true, this would be no valid excuse justifying appellee in refusing to pay demurrage when the same was justly due. Demurrage is secured by a lien on the freight in the specific car for the detention of which the charge has been incurred, and this lien must be discharged before the consignee has any right to demand the possession of the freight. It is manifest, and practically undenied in the record, that appellee denied the legality of demurrage charges as assessed by the car service association, and announced his intention of ignoring its action. In the face of this expressed determination by appellee, the Louisiana Car Service Association and the Yazoo & Mississippi Valley Railroad Company were forced to choose one of two courses: either continue to switch and place cars for appellee without collecting demurrage, and thus allow him an unconscionable advantage over his competitors, and also subject themselves to the penalties provided for disobedience to the mandates of the railroad commission, or invoke the rule which permitted them to refuse to further switch cars for an uncompromisingly recalcitrant consignee. Confronted by this condition, brought about by the persistent refusal of appellee, appellant and the car service association chose the latter horn of the dilemma, and in so doing, in our opinion, they were clearly in the right. The facts do not bear out the suggestion that this order was simply a retaliatory measure on the part of the appellant to punish appellee for his contumacy. Before the order was issued repeated overtures were made to appellee looking to a settlement of the pending differences; propositions of arbitration and an offer of submission to the sole decision of a

gentleman of highest probity, pre-eminent ability, a profound jurist, and closely allied to the appellee, were all rejected. From start to finish of this controversy the issue was forced by appellee. The further switching and placing of cars at appellee's warehouse would have been a delivery of each particular car, and to have thus continued to deliver car loads of freight to a consignee who declared his intention of persisting in his refusal to recognize the validity of demurrage charges would have entailed upon the appellant endless litigation, inasmuch as suit must have necessarily been brought for the demurrage accruing on each shipment, thus breeding a multiplicity of suits and conserving no good end. A just observance of the rights of the shipper and of the consignee is mandatory on every common carrier. They are responsible for actual damages caused by unwarranted and avoidable delay in the transportation of freight, and are accountable for every dereliction of duty. The rights of the shipper and consignee being amply protected, the carrier is entitled to equally fair dealing at the hands of the consignee. If the placing of cars after arrival at destination is unduly delayed, without lawful excuse, the consignee who may be entitled to have his cars switched and placed can recover not only demurrage, but such actual damages as may be caused by the negligent delay of the carrier. With equal justice the carrier has the right to demand and collect of the consignee demurrage for his unreasonable dilatoriness in unloading the cars after they have been so placed. There is a reciprocity of indemnity under the rules governing demurrage promulgated by the Mississippi Railroad Commission. We have narrated somewhat at length the facts and circumstances attendant upon the issuance of the order of August 28th, so that the relative attitudes of the parties might be apparent, for the reason that this will become of vital importance when we come to the consideration of another branch of the case.

The reasonableness of the order, so far as its general tenor and effect are concerned, being established, the question whether

it was rightfully invoked in the instant case does not affect the question of whether a car service association is or is not a trust or combine.  So far as that question is concerned, it may be conceded that the enforcement of the order against appellee was unwarranted; but this, while rendering appellant liable to damages, would not alter the character of the association or in any manner assist us in determining its real nature.  That every railroad company is entitled to charge and receive extra compensation for extra services rendered after the arrival of freight at its destination, such as reconsignment charges, car service or switching charges, demurrage, and the like, and that, acting alone, each railroad would have the right to collect such charges for itself in every proper case, is now finally settled beyond dispute. *State ex rel.* v. *Atchison, etc., Ry. Co.,* 176 Mo., 687 (75 S. W., 776; 63 L. R. A., 761) ; Baldwin, Am. Ry. Law, p. 357; Elliott on Railroads, sec. 1567; *Schumacher* v. *Railroad, supra.*  It could therefore only be for exceptional cause of oppression or wrongdoing that an agreement among several railroads, each of which is entitled to enforce such charges, by which a plan is devised for the accurate assessing and convenient and inexpensive collection of such charges for each of the contracting companies, should be pronounced unlawful by the courts.  An agreement lawful in its character and lawful in its purpose is not rendered unlawful even if some of its members should attempt to put it to an unlawful use.  Eddy on Combinations, 369; *Commonwealth* v. *Brown,* 23 Pa. Sup. Ct., 470.  In *Commonwealth* v. *Carlisle,* Brightly, N. P. 36, the rule is thus stated: "When the act is lawful for the individual, it can be the subject of a conspiracy, when done in concert, only when there is a direct intention that injury shall result from it or when the object is to benefit the conspirators to the prejudice of the public or the oppression of individuals and where such prejudice or oppression is the natural and necessary consequence."  In our judgment the trial judge erred in holding that the order of August 28th, issued under the circumstances set forth in this record, and not of itself

unreasonable in its express terms, being simply the exercise of a power previously sanctioned by this court, was an "esoteric rule" of such baneful nature that it transformed an association lawful in its purpose and beneficial in its results into a criminal conspiracy "inimical to the public welfare." We have found no authority sustaining such a proposition. Eddy on Combinations, p. 1328.

We are next urged to declare the Louisiana Car Service Association a trust and combine, because, it is contended, the testimony in this case shows that its formation involved the delegation by the corporations constituting its membership of the management and control of their business to the persons managing and operating the association; that, these persons not being the "proper officers, agents, or employes" of the railroad companies, therefore the arrangement falls beneath the ban of condemnation pronounced by the law which forbids any person other than the proper officers, agents, or employes of a corporation to "control the management of its business to any extent." And in support of this position it is said: Concede that car service associations, as institutions, are legal in their nature; that, as a general rule, they violate no provision of law, and as operated they are not to the detriment of the public interest; and that they are entitled to be upheld so long as they govern themselves solely by the rules formulated for their government by the railroad commission—still it is contended the testimony shows that this particular car service association to which appellant belongs is a combination in violation of law, because it is not, nor are its operatives, the proper officers, agents, or employes of appellant, and yet the association is vested with power to control the management of the business of its members to some extent. And the special order of August 28th is referred to in support of this argument. But the premises in no wise warrant the conclusion. The argument assumes that the Louisiana Car Service Association and its operatives are not the agents of the appellant, and then assumes that the order referred to was issued in

the exercise of an arbitrary discretion on the part of the manager of the association, and, having thus assumed as true all that it was necessary to prove, proceeds to draw the conclusion indicated. This is "vaulting the chasm," both in logic and in law. Let us see if the proof warrants either assumption. In another connection we have already referred to ch. 82, Laws 1898, whereby the legislature made all car service associations doing business in this state subject to the control and supervision of the railroad commission. In view of this action on the part of the law-making power of the state, having authority to authorize or forbid the operation of such associations, the contention that a car service association is of itself a "combine" forbidden by the law is untenable. It is not conceivable that the legislature would thus recognize and give at least an implied approval to the existence of an association, if the same at that very time stood condemned by the law. It cannot seriously be contended that the legislature acted in ignorance of the end which was sought to be furthered by the formation of such associations or the functions which were exercised by them, for the act itself states that they are "associations governing or controlling cars or rolling stock of railroads." Yet it would be necessary for us to impute this inexcusable ignorance to the legislature if we were to accept as sound the contention that it was thus dealing with an association which was, under § 4437, Code 1892, at that very moment operating in open and palpable violation of law. It cannot be conceived that the legislature would solemnly submit to the supervision and control of the railroad commission an association which could only exist, if appellee's argument be sound, in defiance of express statute. The very fact that the legislature thus gave at least implied sanction to associations which are distinctly recognized as possessing and exercising the power of "governing or controlling cars or rolling stock of railroads" (which is practically the extent of the authority of the car service associations, as it is their prime object) is strongly persuasive that such was not the control or management of busi-

ness "to any extent" dealt with and condemned by paragraphs "g" and "h" of our anti-trust laws. The legislature permitted them to exist as associations "governing or controlling cars or rolling stock of railroads," and this record shows neither the existence nor the exercise of any other authority of control by the Louisiana Car Service Association. Car service associations, like other representatives of corporations, have no authority save such as is specially intrusted to them, and have no power of control beyond the plain and well-defined boundary lines of their duty, and have naught to do with the earnings of the railroads composing their membership, have no connection with any traffic arrangements, are without power to institute suits or proceedings of any kind in the name or on behalf of any of their members, and are in no wise connected with the internal management or financial affairs or corporate policy of any railroad, having not even the power of fixing the demurrage charges which it is their duty to assess. The main end and purpose of their existence is to prove of benefit to consignor, carrier, and consignee by expediting the transportation of freight, facilitating its delivery, and insuring prompter and more satisfactory service by and for all alike. Car service associations are the agents and employes of the various railroads forming such associations. The salaries of the manager and his subordinates are contributed to proportionately by the different members, while within the scope of its employment and duty the association serves and represents all its members. Car service associations are simply the agencies employed by railroad companies for the convenient and accurate assessing of demurrage.

It is also undeniably true that in the instant case the manager of the Louisiana Car Service Association did not assume to have the authority, and in fact did not undertake, to "dictate or control the management of business" of appellant "to any extent" beyond the power granted to all car service associations by the rules of the railroad commission. Before the order of August 28th forbidding the switching of cars to appellee's warehouse in

the future was issued, the same was submitted to the proper officials of the two railroads concerned, and received the approval of one and was put into effect as to that road, while, upon the objection by the officials of the other, it was annulled and revoked as to it. This potential fact stands like a signboard at a parting of the ways, and points unmistakably to the correct conclusion. Is it not proof positive that the manager of the car service association, outside and beyond the rules formulated by the railroad commission, under which this particular association operates, is subordinate to the officials of the railroad to be affected by any special order which he may desire to issue? No other hypothesis furnishes a reasonable explanation of these facts. If the manager was clothed with unlimited and unquestionable authority, what the necessity for conferring with the railroad officials prior to the issuance of the order? If the Louisiana Car Service Association was supreme, why should the order have been rescinded upon the mere objection of the superintendent of one member of the association? Whatever discretionary powers may be vested in the manager of the Louisiana Car Service Association generally, sure it is that this record disclosed no wrongful exercise or abuse thereof. In the absence of proof of injury or wrongdoing, courts will not indulge in inferences to effect the invalidation of contracts or agreeements legal in form. But, aside from the evidence, the weakness which undermines appellee's position is an evident misinterpretation of the meaning of the statute when it forbids corporations placing the "control of the management of business to any extent" in the hands of others than their proper officers, agents, or employes. The argument seems to proceed upon the theory that "control to any extent" is a synonymous expression with "control of any part of its business." But this is erroneous. Every employe of a corporation is vested with power to control to some extent some part of the business of his master; but this does not come within the condemnation of the law, otherwise it would be impossible for any corporation to operate at all. The evil

which the law was intended to prevent was the surrender by one or more corporations of their corporate functions, the delegation of the powers granted by their charters to other persons in no wise subject to or connected with such corporations, so that the business of the several distinct combining corporations would be managed, controlled, and dictated by these chosen trustees. This scheme, according to the most approved authorities, was the first form adopted by "trusts," and it was at this plan that the condemnatory anti-trust law was, in the first instance, directed. "Control" of the business of a corporation, within the meaning of all anti-trust legislation, so far as by our researches we have been able to discover, means power to dictate the corporate action of the corporation, not the mere management of some special limited department of its operations. Noyes on Intercorporate Relations, sec. 294, *et seq.; United States* v. *Northern Securities Company* (C. C.), 120 Fed., 726, and cases cited. If this is not the correct view, it would be unlawful for connecting railroads to employ the same yardmaster, switchman, depot master, ticket agent, or other joint employe at union depots; for in the very nature of things each of such employes has "control of the management of business" of all the corporations which he represents in his particular, though limited, sphere of action. The car service association has no greater power. It, too, is confined within the strict limits of the scope of its duty. If, then, a railroad by joining a car service association does not surrender its corporate autonomy, neither of the assumptions of appellee in this regard can be sustained by the proof. The car service association and its employes are the agents and representatives of the railroad, and the control (in the legal sense) of the business of the railroad is not "to any extent" vested in the car service association. It follows from this view that the question of how the membership of the executive board of the association is constituted is not material.

Again, it is said that under the provisions of sec. 7, ch. 88, p. 128, Laws 1900, in suits like the present one, founded on that

statute, "proof by any party plaintiff that he has been compelled
to pay more for any service rendered by any corporation exer-
cising a public franchise by reason of the unlawful act or agree-
ment of the defendant trust, its officers, agents, or attorneys,
than he would have been compelled to give but for such unlaw-
ful act or agreement, shall be conclusive proof of damage," and
thus proof of damage alone will entitle the plaintiff to recover
the statutory penalty of $500 for each instance of damage. The
argument is presented in this form: The plaintiff has been com-
pelled to "pay more for a service rendered" by the appellant,
which is a "corporation exercising a public franchise." This is
"conclusive evidence of damage;" *ergo,* the plaintiff is entitled
to recover. The argument is adroit, but specious. Its fallacy
consists in this: It ignores the face that, to enable the plaintiff
to recover by the terms of the statute, he must have been com-
pelled to pay more for some service "by reason of the unlawful
act or agreement," and he must have been compelled to give
more than he would have been but for such "unlawful act or
agreement." Concede that appellee was compelled to pay more
for the service of delivering his freight than were his competi-
tors doing business and having warehouses on the same switch;
was this because of any "unlawful act or agreement" on the part
of appellant? By no means. Appellee himself refused to com-
ply with the rules and regulations governing the delivery of cars
to warehouses. Did appellee have to pay more for any service
than he would have been required to pay but for some "unlawful
act or agreement?" The answer must again be in the negative.
Had there been no car service associations, no agreement be-
tween the railroads of any character, appellee must still have
paid demurrage, and this charge was no more and no less,
neither increased nor diminished, by reason of the car service as-
sociation. If there were no car service associations, railroads
would still be entitled to demand car service and demurrage.
This is settled beyond cavil or disputation, settled by custom and
usage, by rule of the railroad commission, by prior decision of

this court. Elliott, Railroads, sec. 1566 and note, sec. 1567; *State ex rel.* v. *Atchison, etc., Ry. Co., supra; N. O. & N. E. R. R. Co.* v. *George, supra.*

We hold that a car service association is not such a "combination, contract, understanding, or agreement" as is condemned by our anti-trust law; that it is not "inimical to the public welfare," does not "infringe upon the rights of the individual or the general well-being of the state," and that it is not an abandonment of corporate autonomy or a delegation of corporate functions. Elliott, Railroads, sec. 1568; *Ky. Wagon Co.* v. *Ohio Ry. Co.,* 98 Ky., 152 (32 S. W., 595; 36 L. R. A., 850; 56 Am. St. Rep., 326); *Railroad* v. *Midvale Steel Co., supra.* See, as illustrative, *State* v. *Terminal Ass'n* (Mo. Sup.), 81 S. W., 396. But, on the contrary, we find that its form is lawful, its aim and purpose legitimate, and its effect beneficial to the public, in that its operation tends to stimulate competition in business and increase the benefits arising therefrom. As the Louisiana Car Service Association is not a "trust or combine" within the meaning of ch. 88, p. 125, Laws 1900, so the appellant, by becoming a member thereof, did not subject itself to the penalties prescribed, and hence appellee is not entitled to recover the statutory penalty awarded by the statute to every one injured or damaged by the operation of a trust.

We have not thought it necessary to burden this opinion with extended extracts from authorities sustaining our position. These have been gathered from a vast field of legal research, and are systematically, accurately, and discriminatingly arranged in the briefs in this case, which are in themselves veritable storehouses of learning upon this and allied subjects. We content ourselves with a reference to them, and a bare citation of a few leading authorities from which we have deduced the general propositions herein announced. The conclusions arrived at upon the construction of our own statutes we give as the result of serious, prolonged, and mature consideration, in which we have not

been unmindful of the gravity of the issues or the immensity of the interests involved.

Much that we have said in this connection applies with equal force to the claim of the appellee for actual damages said to have been suffered by reason of his having to haul his freight by team from the public delivery tracks of the railroad. And right here it becomes important to consider the relative attitude of the parties when the order not to switch cars for appellee was first put in force. The rule imposing demurrage for dilatoriness in unloading cars is binding upon consignees, even if they in fact be in ignorance of its existence. In a very recent case the supreme court of Pennsylvania says: "The further objection to plaintiff's claim is that it does not aver expressly or impliedly that these parties ever became parties to any contract for payment of demurrage on detained cars. But they were parties to the contract of shipment over plaintiff's railroad, and this is averred; and then, further, it is averred that since the demurrage rule was adopted it has formed part of the contract of shipment. This is sufficient averment of the implied contract. As a consignee of goods over plaintiff's railroad, it impliedly contracted to submit to all reasonable rules for the regulation of shipments. That the shipper was not consulted in framing the rules does not affect their validity. *Wagon Co.* v. *Ohio Railway Co., supra.* There is no duty on a common carrier to consult either its shippers or consignees as to the wisdom of its rates of freight for carrying or rules for demurrage. As to the one, it cannot exceed a lawful rate; as to the other, it cannot exceed a reasonable charge. Within these bounds it is presumed, in the interests of its stockholders and the public, to properly conduct its own business." *Railroad* v. *Midvale Steel Co.*, 201 Pa., 630 (51 Atl., 313; 88 Am. St. Rep., 836); *Schumacher* v. *Railroad, supra.* The instant case falls clearly within this reasoning. The bills of lading under which appellant handled the cars giving rise to this litigation—"the contract of shipment"—contained an express provision that all car-load freight should be liable

to charge for "trackage and rental" for detention, said charge to commence "after the expiration of forty-eight hours from its arrival at destination." This was appellee's contract with appellant, and the law imputes to him knowledge of its terms, and he was legally bound thereby. The soundness of this proposition was recognized by the trial judge. We quote from his opinion: "There was probably no legal excuse for plaintiff's conduct in the premises, for he was legally bound to observe any reasonable rules in force as to demurrage and car service." But it is further said that appellee's wrongful action did not justify the railroad company "in violating its common-law and statutory obligation" to appellee to deliver freight; this conclusion, of course, being founded on the principle that in the discharge of its duty to the public no corporation enjoying a public franchise can conduct its business according to the whim or caprice of its agents, or can arbitrarily, without special reason, refuse to serve any one seeking its service. Limiting that general principle to the matter here in dispute, it is likewise true that no carrier has the right, on account alone of a dispute arising from a doubt as to the correctness of a particular bill or several bills for demurrage already past due or an honest difference of opinion as to the justice of the charge on any number of cars already received and delivered, to refuse to "switch and place" other cars subsequently received. No carrier can refuse its services to any one desiring them on the ground alone of an unadjusted claim then pending, or on account of any previous violation of contract by such person, no matter how flagrant and inexcusable, if such person at the time the service is demanded is legally entitled thereto. A refusal on the part of the carrier in such case would entitle the person aggrieved or injured to recover full compensation; and if such action was dictated by vindictive motives or by a desire to wantonly oppress and injure the particular person, the offending carrier would be liable to punitive damages as well. But this result follows not because the carrier was a member of a car service association, but by reason of the

firmly established and rigidly adhered to rule of law which makes the master respond in damages, both actual and exemplary, for every wanton and willfully oppressive violation of duty by the servant, whether the servant committing the wrong be a car service association or other agent or employe. This principle of law is of universal application. It was the duty of the appellant primarily to "switch and place" all cars coming over its own line or tendered to it with proper "transfer switching charge" by any connecting line. It was the duty of the appellee to pay all freight charges and demurrage charges due on his freight and the cars containing the same. This, by contract entered into, evidenced by the bills of lading, he had bound himself to do. So long as appellee complied with his contract, he had the right to insist on faithful and prompt compliance on the part of appellant. More than this, even if, on account of doubts and disputes as to the correctness of justice of special instances of charge, freight charges or demurrage had been withheld pending adjustment, this would not of itself absolve the carrier from the discharge of its duty as to other car loads of freight subsequently received. No past violation of contract on the part of a consignee can justify a carrier in failing to discharge a present duty. But in the case at bar, according to the testimony for the appellant, not directly denied by appellee, appellee not only arbitrarily refused to pay demurrage charges which had accrued in the past, but expressed his intention of persisting in his refusal even should such charges be justly incurred in the future. If this be true, appellant was warranted in its refusal to further switch and place cars at appellee's warehouse. By delivering the cars at the warehouse appellant would have lost its lien, and could only have collected its charges from appellee directly, and he had already evidenced his intention of not paying. We know of no principle of law under which any one can announce an intention of not paying for a particular service and still rightfully demand that such service shall be rendered, particularly where the charge for such service is ad-

mitted to be just and reasonable and is in fact paid by all others who enjoy the benefit of it. And yet this is the attitude occupied by appellee, if the testimony for appellant, uncontradicted in this record, be true. Nor is it true, as contended, that consignees are liable to imposition in the collection of demurrage charges because of the rule which requires that the payment of demurrage bills shall not be unduly delayed, and that no claim of mistake or overcharge will be considered unless the bill for demurrage, over which the dispute arises, has been first paid. Car service associations can collect demurrage only in the amount and under the circumstances permitted by the railroad commission. If they disregard those rules, and undertake to extort more, or to collect when not entitled thereto, they are liable to all the penalties prescribed against common carriers for disobedience of the mandates of the railroad commission. In addition, the consignee would have his action for damages for any extortion which might be imposed on him by collecting more than was due or for refusing to "switch and place" cars when no demurrage was due and when the payment of no bill really due had been unduly delayed. In a suit for such damages the burden would be on the carrier to prove that such unpaid demurrage was properly assessed, was justly due, and payment thereof had been either refused or unduly delayed after demand for payment first made. As the duty is on the carrier to serve all patrons alike, in case of failure to do so it devolves on it to prove facts which, under the rule, will justify its action. The law affords ample protection to the consignee against both extortion and discrimination.

Appellee's contention that he had a right to refuse to pay because the bills of charges were made out by direction of the car service association, and on its letter heads, we mention simply to reject. They were made out in favor of appellant, were due to appellant for services claimed to have been rendered by it, and appellant had the right to employ such lawful agency as it chose for the discharge of its private business. It would scarce-

ly be seriously contended that a consignee who had repeatedly failed to pay transportation charges when the freight was delivered to him without prepayment being required could still rightfully demand that he be allowed to continue to remove the freight without first paying the charges. And yet the right of the railroad company to collect freight charges is no better established than is its right to collect demurrage in proper cases. One is for the transportation of the freight and the use of the cars in transit; the other, for the use of its track and rental for the cars after they have arrived at their destination.

The evidence adduced on the trial proved conclusively that prior to the refusal of appellee to pay demurrage the same treatment was accorded him as all others similarly situated, and this makes manifest the accuracy of the statement quoted from the opinion of the trial judge that "there was no legal excuse for plaintiff's conduct in the premises." Inasmuch, therefore, as appellee himself violated the terms of his contract of shipment without "legal excuse for his conduct," and as the actual damages complained of were entailed on him as the result of his own act, this judgment cannot be sustained. One who himself first wrongfully breaches a contract has no standing in court when he seeks to recover damages caused by a failure of the other party to fulfill his part of the same contract.

*Reversed and remanded.*