**ST. LOUIS-S. F. RY. CO. v. SLADE.**

No. 19658.   Opinion Filed Oct. 28, 1930.

Rehearing Denied Dec. 9, 1930.

E. T. Miller, Cruce & Frank'in, and W. T. Stratton, for plaintiff in error.

T. G. Chambers, Jr., and Ben C. Arnold, for defendant in error.

HALL, C.  Plaintiff sued to recover damages for injuries to 17 head of hogs which he placed in defendant's loading pens for future shipment; and also for the loss of 103 other hogs by reason of the alleged negligent handling by defendant of the 17 hogs.  Plaintiff asked for the sum of $2,-756.56.

The facts in the case are substantially as follows:  The plaintiff in error, who will hereinafter be referred to as the defendant, is a common carrier of freight and passengers and operates a system of railways in this state and through the town of Soper. The plaintiff was a considerable live-stock dealer and maintained feeding and detention pen for hogs in the town of Soper. During the latter part of March, 1927, the plaintiff claims to have placed an order with the railway agent for two live-stock cars. On a certain Monday one of these cars was spotted or set by the side of the company's loading pens in that town, and plaintiff loaded the car with hogs, placing therein about 65 in number.  The car was shipped out that night to Ft. Worth, Tex.

On Sunday evening or Sunday night, before the following Monday, plaintiff purchased from some one 14 hogs, which he says were wild or "outlaw" hogs.  Instead of putting these hogs in his own pen or some other pen, he put them in the railway company's loading pen.  He did not ship these wild hogs in the car to Ft. Worth, but he testified that it was his intention to ship them the following Wednesday to Norman, Okla.  Plaintiff left town Tuesday and did not return until Wednesday.  On Wednesday morning, sometime before noon, the agent of the railway company received a telegram from the freight traffic department that a carload of cattle was en route over the line from Ashdown, Ark., and that the cattle would have to be unloaded for food, water and rest at the loading pens at Soper. The agent of the railway company claimed that he did not definitely know the ownership of the hogs in the company's loading pen, and he therefore went to a man named Chadwick and one Rupert Jones, who were livestock dealers, and inquired about the ownership of the hogs, and stated that the hogs would have to be removed from the pens, for the reason that the company had to use the pens for unloading an interstate shipment of cattle as aforesaid.  The hogs not belonging to either Jones or Chadwick, the agent got but little satisfaction, whereupon, after a short while, he again went to see them and told them if they or somebody else did not get the hogs out of the company's pen, he would turn them out. Chadwick and Jones sent their trucks and ro-

moved the hogs from the railway company's loading pen to the live-stock (hog) pens belonging to plaintiff in which he had other hogs. These hogs which were removed from the loading pens to plaintiff's pen did not have a disposition to stay circumscribed within plaintiff's enclosure, and they broke out, taking with them other hogs. Some of these hogs were never recovered.

The cause was tried and submitted to a jury on the question of the loss and value of the 17 hogs. It seems that the issue concerning the loss of the 103 tame hogs was lost or abandoned during the trial. The jury returned a verdict in favor of plaintiff for the sum of $523. The case was regularly appealed to this court, and in seeking to reverse the judgment, counsel for plaintiff in error submit several assignments of error. However, all the assignments except one are directed at the insufficiency of the evidence to justify a recovery in favor of plaintiff. This question was raised by a demurrer to the evidence, and a request for a peremptory instruction to find in favor of the defendant.

As previously stated, plaintiff had ordered a car for shipment of a carload of hogs to Ft. Worth. He loaded this car Monday afternoon by getting hogs from his feeding pen, which was about one-half mile away, and placing the hogs in the loading pen from which they were loaded in the car. The 14 hogs which plaintiff put in the loading pens were not included in the shipment to Ft. Worth, but that number, together with three others, were left by plaintiff in the loading pens. These hogs form the principal controversy involved in this lawsuit.

Plaintiff testtified that it was his intention to ship these hogs. We assume that that statement was correct; but the question is whether or not he intended to immediately ship them; that is, ship them in the usual course. To this question there can be but one answer. Plaintiff testified that he did not intend to ship these hogs until Wednesday night. He placed them in the company's loading pens on Sunday night or Monday morning and hired a boy to feed them. After he had loaded and shipped the car of hogs to Ft. Worth, he went out of town. The stock car could have been spotted by the local train at the loading pen on Tuesday at sometime after twelve o'clock. That fact was shown by plaintiff's witness, Earl Page. Plaintiff also testified that sometimes the fast trains spotted cars and that they spotted one for him.

While it is not a decisive factor in this case, it is somewhat interesting to note the absolutely indefinite character of his testimony in regard to ordering a car for the purpose of shipping these 17 hogs. In this connection plaintiff testified as follows:

"Q. Did you make any shipment in **March** along about the **27th** or **28th**? A. Yes, sir." (This was the shipment to Ft. Worth.) "Q. Did you make any arrangement for a car to make this shipment in? A. Yes, sir. Q. When did you make arrangements for that car? A. I suppose on Saturday **or** Friday, I was going to ship the hogs Sunday night. I got a wild hog, he run off, I never got the load completed until **Monday.** Q. Who did you make the arrangement with? A. Clark, the agent. Q. You saw him on Friday or Saturday? A. Yes, you have to give them two or three days' notice. Q. You gave them two or three days' notice? A. **I suppose I did.** Q. Do you remember what you told him with reference to the hogs? A. **I ordered a couple of cars from him.** * * * Q. You said you had ordered— at the time you shipped this one shipment to Fort Worth of 65 hogs, that you had ordered two cars? A. Yes, sir. Q. Do you remember when you ordered them? A. No, sir, I don't. Q. You ordered them at the same time? A. I don't know for sure that I ordered both at the same time. Q. You make a written application, sign an application? A. Some I signed, some I didn't. Q. How about this particular instance? A. I couldn't say. Q. Did you 'phone to or talk to the agent? A. I talked to him about it, down at the station. Q. There was a car there on Tuesday morning, the 29th, already a stock car there? You didn't order the car for Ft. Worth, there was a car there. The car was there without you ordering? A. I ordered a car. Q. You didn't order two because one was already there? A. I told him I wanted two cars, one to go to Fort Worth and one to Norman. Q. When you first mentioned cars for this particular shipment you told him you wanted two, although there was one there? A. Might have been. * * * Q. As a matter of fact, the through train, they spot those cars? A. They never spotted any for me. I never seen them spot cars. I will take it back, they spotted one. Q. You know they will do it? A. They spotted one."

One of the reasons urged why defendant's demurrer to plaintiff's evidence should have been sustained, and that the court should have directed a verdict in favor of defendant, is that no testimony was introduced which would reasonably tend to show that the hogs were in the loading pens by the consent, express or implied, of the railway company; that there was no evidence that the hogs were in the pens to facilitate shipment; that the acts and conduct of the rail-

way agent in procuring plaintiff's hogs to be moved out of the company's loading pens did not, as a matter of law, amount to gross or wanton negligence.

After a careful review of the testimony, we are of the opinion that the court should have instructed the jury to return a verdict for the defendant for the reasons aforesaid.

On several occasions and prior to the time of this incident, plaintiff had been using the railway company's live-stock loading pens for his own convenience and accommodation, and not for a purpose incidental to shipping; that is, he had been using the pen for the purpose of assembling and the detention of live stock until he could purchase a sufficient quantity for shipment, thereby making a feeding pen out of the company's loading pens erected for the use of the public, only to facilitate shipment. It is conceded that this use of the stock pen was objected to by the railway company.

There was introduced in evidence a signed requisition by plaintiff for a car for the shipment of the live stock from Soper to Ft. Worth. This shippers' requisition appears to have been made on Saturday preceding the shipment Monday. After this instrument was shown plaintiff he admitted he signed it. This requisition seems to be a somewhat formal instrument. Plaintiff, when interrogated about making application or requisition for two cars, didn't know whether or not he signed such application. The certainty of his testimony in this respect receded and dwindled away to the point where he did not know when he made an application for the additional car, leaving the matter in a state of supposition. Furthermore, the car for shipping the load of hogs to Ft. Worth had been procured and spotted with ordinary diligence and speed. It was requested Saturday (plaintiff says Friday or Saturday) and it was spotted Monday morning or Sunday night. There was another car in the yards and if plaintiff wanted to ship the 17 hogs which he had in the shipping pen, without some special arrangement with the railway company, he should have presumed that the railway company would have used the same diligence and speed in spotting another car which they had used in spotting the one on the previous day, in which instance the car would have been spotted or set at the loading pens on Monday night or Tuesday afternoon or Wednesday morning. However, regardless of that situation, he left

town on Tuesday morning and did not return until Wednesday and left no directions for loading the car, but did leave directions for feeding the stock. It appears that the stock car which was in the yards during that period of time was later used by plaintiff in shipping a carload of cattle.

With the foregoing facts in mind, it is conclusive that the plaintiff did not have the 17 head of hogs in the loading pens for immediate shipment, and that he was not using the pen as an incident to the transportation of the hogs, but was using the pen for his own private purposes, to wit, a feeding and detention pen, and not for a purpose incident to the transportation of the live stock. That conclusion is irresistible when we take into consideration a vital fact upon which the entire controversy is founded, to wit, that the hogs—or 14 of them—which were in the loading pens, were hogs of a wild nature, and that plaintiff had not provided himself with a pen sufficiently strong to confine or hold that character of hogs. For that reason he was using the railway company's pen instead of his own. Plaintiff himself furnished this testimony.

Having reached the conclusion that the hogs were not in the loading pen with the express or implied consent of the railway company for the purpose of immediate shipment, it is clear that the defendant owed the plaintiff no other duty in relation to said hogs other than to do no act willfully or wantonly to injure them; or, in other words, the defendant's conduct to be actionable would have to amount to gross negligence.

The court submitted to the jury as an issue in the case the nature of plaintiff's occupancy and use of the defendant's loading pens; that is, whether the use of the pens for the purpose of retaining the 17 hogs was with the consent of the defendant. But as there was no evidence upon which the jury could rightfully find on the question submitted other than in one way or in one direction, the instruction should not have been given, and the matter was improperly submitted to the jury.

The right of the defendant to the use of its loading pens for the purpose of unloading, feeding and watering interstate shipments of live stock cannot be challenged.

Under no legal theory can it be said that the conduct of the defendant (in causing the hogs to be removed from its loading pens to plaintiff's feeding and detention pens) amounted to gross negligence or a wanton

handling of the hogs. This being true, it logically follows that the defendant committed no breach of duty to the plaintiff, and no actionable negligence arises by its conduct.

With much force it is argued that the defendant, in moving the hogs, was exercising ordinary or due care in placing them in plaintiff's own enclosure. This argument is based upon the fact that plaintiff at the time had a large number of miscellaneous hogs in his feeding and detention pen in which defendant caused the particular hogs in question to be placed. Plaintiff had kept hogs in this particular pen for a considerable time; and that no witness testified that defendant's agent, Clark, or Chadwick or Jones knew at that time of any defect in the pen, or had cause to know that the pen was insecure or unsuitable for the purpose of confining the hogs. However, we express no opinion on that question, as a disposition of the other question disposes of the case.

One of the purposes of maintaining a loading pen with which live stock may be loaded on railway cars for the purpose of shipment over the railroads is the fact that such is a necessary utility for the public. The other use or purpose of such a loading pen is to produce revenue for the railway or transportation company. Such pens were never intended to furnish the individual a place for assembling and feeding live stock not intended for immediate shipment. Any other rule or regulation, if in operation, especially in a considerable live-stock producing section of the country, would result in much confusion. In this day or time, in which speed and time seem to be the essence of so many things, especially in transportation, it would create a rather anomalous situation for a shipper of live stock to take a carload or shipment to the loading pens of a transportation company and there find the pens occupied by some other persons who intended to keep his stock in the pens and use such for feeding and assembling purposes for three days. In such a case the public and the railway company's paramount right to use the property for the purposes directly incident to transportation would be greatly impaired. The principle upon which this rule rests has been thoroughly considered in an exhaustive opinion by this court in the case of Gault Lumber Co. v. Atchison, T. & S. F. Ry. Co., 37 Okla.. 24, 130 Pac. 291.

The demurrer to plaintiff's evidence should have been sustained, and the court should have instructed a verdict for defendant.

The judgment, therefore, is reversed, with directions to vacate and set aside the judgment and render judgment for the defendant.

TEEHEE, HERR, LEACH, REID, and EAGLETON, Commissioners, concur.

By the Court: It is so ordered.